# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF ARKANSAS
## EL DORADO DIVISION

| | | |
|---|---|---|
| **Estate of Eusebio Castillo Rodriguez, Deceased, by its Special Co-Administratrices, Amanda Castillo and Cary Rios, on behalf of the Estate and Its Wrongful Death Beneficiaries** | § § § § § § | |
| **Plaintiffs,** | § § | **CIVIL ACTION NO. _____** |
| **v.** | § § | **JURY TRIAL DEMANDED** |
| **Union County, Arkansas; Association of Arkansas Counties Risk Management Fund; Turn Key Health Clinics LLC; Turn Key Health Medical Arkansas, PLLC; Community Health Systems Professional Services Corporation a/k/a Medical Center of South Arkansas; and South Arkansas Emergency Physicians, LLP a/k/a Arkansas Hospitalist Physicians and South Arkansas Hospitalists** | § § § § § § § § § § § | |
| **Defendants.** | § § | |

---

## PLAINTIFFS' ORIGINAL COMPLAINT

---

## TABLE OF CONTENTS

Table of Authorities .................................................................................................... iii

Introduction ............................................................................................................... 1

Jurisdiction and Venue ........................................................................................... 1

Parties ......................................................................................................................... 2

Factual Allegations ................................................................................................. 7

Causes of Action ...................................................................................................... 18

Damages ..................................................................................................................... 30

Jury Demand ............................................................................................................. 31

Prayer for Relief ...................................................................................................... 31

# TABLE OF AUTHORITIES

**STATUTES AND AMI**

42 U.S.C. § 1983.........................................................................1, 3, 5, 18, 21

28 U.S.C. § 1341 ................................................................................. 1

28 U.S.C. § 1343 ................................................................................. 2

28 U.S.C. § 1367(a) .............................................................................2

28 U.S.C. § 1391(3) .............................................................................2

Ark. Code Ann. § 16-62-101...............................................................19, 24, 29

Ark. Code Ann. §16-62-102................................................................19, 24, 29

Ark. Code Ann. § 16-114-201 ............................................................22, 26

Ark. Code Ann. § 16-123-105...........................................3, 5, 19, 20, 24, 25, 29

Ark. Code Ann. § 23-79-210................................................................4

AMI (CIVIL) 712................................................................................29

AMI (CIVIL) 1501..............................................................................23, 28

AMI (CIVIL) 1504..............................................................................28

AMI (CIVIL) 2216..............................................................................30

**CONSTITUTIONAL PROVISIONS**

U.S. CONST. amend. XIV..................................................1, 3, 18, 20, 21, 25

Ark. CONST. art. 2 § 8.......................................................................20, 25, 29

Ark. CONST. art. 2 § 15......................................................................20, 25, 29

Plaintiffs, Amanda Castillo and Cary Rios, by their attorneys, The Law Offices of Darren O'Quinn, PLLC and Galvis Law, PLLC, for their complaint, state:

## I.    Introduction

1.    This is a civil rights action under *42 U.S.C. § 1983* and the laws of the state of Arkansas resulting from events that happened during and immediately after the detention of Eusebio Castillo Rodriguez at the Union County Detention Center, which sits in Union County, Arkansas and whose medical care is subcontracted to private, for-profit correctional limited liability companies, Turn Key Health Clinics LLC and Turn Key Health Medical Arkansas, PLLC.

2.    The events that give rise to this complaint began on Wednesday, June 8, 2022, and culminated in the unnecessary and avoidable  death of Rodriguez on Wednesday, June 22, 2022. Defendants caused Rodriguez's death by violating his rights under the *Fourteenth Amendment*  to the *United States Constitution* and under the laws of the state of Arkansas.

3.    Defendants' unlawful actions include depriving Rodriguez of adequate medical care, ignoring his ongoing serious medical needs, including his obvious acute distress, failing to monitor and assess him despite his severe and life-threatening medical condition, otherwise forcing him to endure extreme and needless pain and suffering, and causing his death.

## II.    Jurisdiction and Venue

4.    This Court has original subject matter jurisdiction over the plaintiffs' civil rights claims under *42 U.S.C. § 1983*, pursuant to *28 U.S.C. § 1331*(federal

1

question) and *28 U.S.C. § 1343* (civil rights). This Court has supplemental jurisdiction over the plaintiffs' related state claims pursuant to *28 U.S.C. § 1367(a)*.

5.     This Court has personal jurisdiction over each of the named defendants because they either (1) reside in this judicial district, or (2) they have sufficient minimum contacts in the state of Arkansas, and the exercise of personal jurisdiction would not offend traditional notions of fair play and substantial justice.

6.     Venue is proper in this jurisdiction under *28 U.S.C. § 1391(3)* because all defendants are subject to this Court's personal jurisdiction in this action.

### III.     Parties

### A.     Plaintiffs

7.     Plaintiff, Amanda Castillo, is a resident of El Dorado, Arkansas. Amanda Castillo is the daughter of the decedent, Eusebio Castillo Rodriguez. She is also one of the special co-administratrices of the Estate of Eusebio Castillo Rodriguez, which was duly formed under Arkansas law in the Union County Circuit Court, Probate Division, No. 70PR-22-180. Amanda Castillo is a plaintiff in her capacity as the personal representative of her late father's estate and for the benefit of all statutory beneficiaries.

8.     Plaintiff, Cary Rios, is a resident  of El Dorado Arkansas. Cary Rios was the domestic partner of the decedent, Eusebio Castillo Rodriguez, and the mother of Eusebio's three children, including two minor children. She is also one of the special co-administratrices of the Estate of Eusebio Castillo Rodriguez, which was duly formed under Arkansas law in the Union County Circuit Court, Probate

Division, No. 70PR-22-180. Cary Rios is a plaintiff in her capacity as the personal representative of her late domestic partner's estate and for the benefit of all statutory beneficiaries.

## B. Defendants

### 1. The Municipal Defendants

9.      Defendant Union County, Arkansas ("Union County") is a governmental entity and a political subdivision of the state of Arkansas and is a "person" for purposes of *42 U.S.C. § 1983* and *Ark. Code. Ann. § 16-123-105*. Union County is responsible for operating the Union County Detention Center, which sits in Union County, Arkansas. The Union County Detention Center houses pretrial detainees and convicted inmates. All detainees confined at the Union County Detention Center are entitled to constitutional protections under the *Fourteenth Amendment* to the *United States Constitution*, including the right to constitutionally adequate medical care and the right to be free from constitutionally cruel and unusual punishment (unacceptable due to the suffering, pain, or humiliation it inflicts on the person subjected to the sanction). Union County has a non-delegable duty to ensure that the Union County Detention Center meets such constitutional requirements. Union County may be served via its County Judge, the Honorable Mike Loftin, at 101 North Washington, Room 101, El Dorado, Arkansas 71730.

10.      Defendant the Association of Arkansas Counties Risk Management Fund ("AACRMF") is a multi-county, self-funded insurance trust of Arkansas

3

counties formed for legal services, including defense and financial protection when its participating counties have been sued, including defendant Union County. AACRMF is a citizen of the state of Arkansas. To the extent defendant Union County claims and is entitled to immunity, AACRMF, who at all relevant times was a liability insurance carrier, self-insurance fund, pooled liability fund, or similar fund maintained by defendant Union County doing business in Union County, Arkansas, and who insures/indemnifies defendant Union County for claims such as those made in the lawsuit is named as a party and liable for the actions of defendant Union County pursuant to *Ark. Code Ann. § 23-79-210*. AACRMF may be served via it Executive Director, Chris Villines, at its Administrative Office is located at 1415 W 3rd St, Little Rock, AR 72201.

11.     Beginning on August 1, 2021, and ending on July 31, 2022, Union County contracted with a private, for-profit correctional corporation, known as Turn Key Health Clinics LLC and Turn Key Health Medical Arkansas, PLLC (collectively "Turn Key"), to supply, coordinate, and manage the health care delivery system at Union County Detention Center, including the provision of medical care to the jail's population of pretrial detainees and post-conviction prisoners. The contract between Union County and Turn Key was extended on July 28, 2022, to cover the time period of August 1, 2022, to December 31, 2022. *See Exhibit A, Turn Key Contract*.

12.     Although Union County sought to privatize the operation of its jail's medical care by delegating its day-to-day decisions and medical policy-making

4

authority to Turn Key, Union County cannot contract away its non-delegable constitutional obligations and is liable for any unconstitutional corporate customs or policies that resulted in harm to any detainees and inmates confined in the jail.

### 2.      The Corporate Defendants

13.      Defendants Turn Key Health Clinics LLC and Turn Key Health Medical Arkansas, PLLC (collectively "Turn Key"), are foreign for-profit correctional care limited liability companies doing business in this judicial district that are that is organized and existing under the laws of the state of Oklahoma. Turn Key is considered a "person" under *42 U.S.C. § 1983* and *Ark. Code. Ann. § 16-123-105*. Turn Key coordinates the medical operations of the Union County Detention Center including that for the Union County Detention Center's detainees and inmates. Turn Key is a medical decision-maker for Union County for purposes of providing jail-related services and meeting the needs of its pretrial detainees and convicted inmates. Turn Key is authorized to do business and conducts business in this judicial district. According to the Arkansas Secretary of State, Turn Key Health Clinics LLC's registered agent for service is CT Corporation System, 124 West Capitol Avenue, Little Rock, Arkansas 72201 and Turn Key Health Medical Arkansas, PLLC's registered agent for service is Incorp Services, Inc., 4250 Venetian Lane, Fayetteville, Arkansas 72703, respectively. At all material times, Turn Key was acting under color of state law.

14.      Defendant Community Health Systems Professional Services Corporation a/k/a Medical Center of South Arkansas (hereinafter "Medical Center

of South Arkansas") is a foreign for-profit hospital corporation with a location in Union County, Arkansas providing care to the weak, sick, enfeebled, and vulnerable population in Union County, Arkansas (including the Union County Detention Center's detainees and inmates) that is organized and existing under the laws of the state of Tennessee. The Medical Center of South Arkansas is authorized to do business and conducts business in this judicial district. According to the Arkansas Secretary of State, The Medical Center of South Arkansas registered agent for service is Corporation Service Company, 300 Spring Building, Suite 900, Little Rock, Arkansas 722201.

15.     Defendant South Arkansas Emergency Physicians, LLP a/k/a Arkansas Hospitalist Physicians and South Arkansas Hospitalists ("Emergency Physicians") is a foreign for-profit emergency department limied liability partnership with a location in the Medical Center of South Arkansas's emergency department in Union County, Arkansas providing care to the weak, sick, enfeebled, and vulnerable population in Union County, Arkansas (including the Union County Detention Center's detainees and inmates) that is organized and existing under the laws of the state of Michigan. Emergency Physicians is authorized to do business and conducts business in this judicial district. According to the Arkansas Secretary of State, Emergency Physicians registered agent is C T Corporation System, 124 West Capitol Avenue, Suite 1900, Little Rock, Arkansas 722201.

## IV.          Factual Allegations

### A.     Facts Applicable to All Defendants

16.     Eusebio Castillo Rodriguez ("Rodriguez") is a Hispanic male who died on June 22, 2022, at the age of forty-two years.

17.     On July 27, 2022, a Petition to Appoint a Special Administrator was filed in Union County Circuit Court, Probate Division, Case No. 70PR-22-180 and was granted on August 31, 2022.

18.     Rodriguez was survived by three children: Amanda Castillo (the co-administratrix of his estate) and two minor children, namely JCC and NR.

19.     Rodriguez was arrested on April 27, 2022, and charged with driving while intoxicated, driving with a suspended license, and having an open container of alcohol in his vehicle. Rodriguez was released that same day from the Union County Detention Center on his own recognizance to his daughter Amanda.

20.     Rodriguez  appeared before the Union County District Court on June 6, 2022, however, there was no interpreter present, so the Court reset his court date to June 8, 2022. *See Exhibit B, Docket Report.*

21.     Rodriguez again appeared in the Union County District Court on June 8, 2022, for his sentencing hearing. An interpreter was present at the hearing through a speaker phone. *See Exhibit C, AOC Interpreter Docket.*

22.     The Union County District Court's record indicates that Rodriguez appeared without counsel, waived the right to a public defender, and pled guilty to all counts.

23.     The Union County District Court's record further indicates that Judge Jack Barker suspended the one-year jail time for Rodriguez's DWI charge and the ten-day jail sentence for the charge of driving with a suspended license. The suspension of both sentences was conditioned on Rodriguez's compliance with the court's orders.

24.     At the end of the hearing, Judge Barker asked Rodriguez if he had any questions. Rodriguez responded in Spanish, stating: "I have seen many cars drive over the traffic lines because the driver was drunk, and the police haven't done anything, except for me because I am Mexican." *See Exhibit D, Partial Transcript of June 13, 2022 – DWI-22-19.*

25.     Instead of properly interpreting Rodriguez's words to the Court, however, the interpreter delivered this mistranslation: "So, I am not really understanding why there are so many different charges. I wasn't that drunk, and I just feel like the police were following me."

26.     Frustrated by what the interpreter's mistranslation led him to believe Rodriguez's statements were, Judge Barker chose to reinstate the previously suspended ten-day jail sentence for driving without a license -- resulting Rodriguez being taken into custody on the spot and immediately transported to the Union County Detention Center for intake.

27.     Due to the fact that Rodriguez suffered from several non-life-threatening health concerns, such as diabetes, hypertension, and high-blood pressure, Rodriguez's daughter Amanda immediately informed the Union County

Detention Center of Rodriguez's medical conditions and subsequently brought his medications to the jail. *See Exhibit E, Castillo Medical Intake June 9, 2022.*

28.     Rodriguez was initially held in a group booking cell with other inmates until about 2:40 pm on Friday, June 10, 2022, when he was moved to "pod-H," a general population cell block within the Union County Detention Center.

29.     Rodriguez's family visited him by video-call on the afternoon on June 10, 2022. During this visit, his family noticed and was alarmed that Rodriguez was shaking severely, appeared to be disoriented, and displayed several other symptoms of alcohol withdrawal.

30.     Without any knowledge of the ultimately fatal condition Rodriguez was developing while in the Union County Detention Center, his family made a second report to the Union County Sherriff's Office detailing their concerns for his health.

31.     The Union County contract with Turn Key provides the Union County Detention Center with two LPN nurses working on twelve-hour shifts to ensure that one is onsite at all times during the week, and are on-call during the weekends. The nurse's station is located in the same wing of the jail where Rodriguez was housed.

32.     The nurses and guards were aware of Rodriguez's pre-existing conditions as he continued to deteriorate over the course of his approximately five-day incarceration in the Union County Detention Center, especially as his health began to rapidly decline over the weekend, yet did nothing to assess, intervene, or treat his symptoms -- and at no time attempted to report his significant change in condition to a doctor or recommend that Rodriguez be transported to the hospital.

9

33.     As Rodriguez's withdrawal symptoms continued to worsen, he attempted to communicate with the guards, trying to make them aware of the severity of his condition, and asking them to get him medical help beyond the nurses' cursory efforts, but was essentially ignored due to the language barrier and the guards' indifference. Although the guards had access to a translation application, which would have facilitated communication with Rodriguez, they instead tried to speak to him in English and made no effort to understand his responses.

34.     The amount of pain and discomfort that Rodriguez was suffering due to his increasingly severe withdrawal symptoms became so intense that at midnight on Saturday, June 12, 2022, he was removed from pod-H because he was moaning and making it difficult for other inmates to sleep.

35.     Rodriguez was moved to a booking cell reserved for solitary confinement.

36.     Although nurses continued to perfunctorily monitor Rodriguez's vital signs, they at no point attempted to engage in any meaningful communication regarding his mental state and medical condition, and at no point recommended he be seen by a more qualified medical professional or taken to the hospital.

37.     Predictably, at roughly 8:30 pm on Sunday, June 12, 2022, a guard saw Rodriguez hunched over in pain through the window in the solitary cell, but did nothing to help him, and did not even report his condition to the nursing staff. *See Exhibit F, Screenshot of Body Camera Video.*

38.     Rodriguez was found half-naked, incoherent, and trembling severely while lying face down on the floor of his solitary cell at roughly 5:15 am on Monday, June 13, 2022. *See Exhibit G, Affidavit of Sgt. Walka.*

39.     While there are alleged "wellness check" records for June 11, June 12, and June 13, 2022, there is only one bodycam recording of such purported checks.

40.     Additionally, the solitary confinement cell had visible camaras, which recorded the severe decline in Rodriguez's health; however, Union County has not provided that footage when it was requested despite numerous attempts by plaintiffs to get it (leading to the question of possible spoilation of evidence).

41.     In any event, Turn Key employee Kasey Sanford, LPN did not arrive for her shift until 7:56 am on Monday, June 13, 2022.

42.     During the two hours and forty-one minutes from when Rodriguez was discovered lying face down on the floor of his solitary cell until this nurse arrived for her shift, there were no attempts by the guards to check on Rodriguez's condition or render assistance. Further, the guards continued to mark Rodriguez as "OK" on their wellness checks for the entirety of that time period.

43.     Mercifully, once the nurse arrived in the facility, the guards lifted Rodriguez off the ground and at least placed him in a wheelchair in order to transport him to the nurse's station.

44.     Over the course of the next hour, the jail staff transported Rodriguez's unconscious body to the nurse's station and then back to the booking cell, where the guards changed him out of his jail uniform and into his civilian clothing. He was then

wheeled out of the jail and placed into a police vehicle, which they originally intended to use to transport him to Medical Center of South Arkansas.

45.    During this time, Captain Richard Mitcham, the Union County Detention Center's administrator, managed to procure Judge Jack Barker's signature, releasing Rodriguez from the custody of the Union County Detention Center via a Speed Letter due to a "medical condition" in order to avoid being held liable for the costs of Rodriguez's medical treatment. *See Exhibit H, Speed Letter*.

46.    Once released from their custody, the jail staff and nurses for Turn Key chose to call an ambulance, which arrived at about 9:00 am and transported Rodriguez to The Medical Center of South Arkansas. – this was almost four hours after Rodriguez had been found half-naked, incoherent, and trembling severely while lying face down on the floor of his solitary cell at roughly 5:15 am.

47.    At no point was Rodriguez's family informed of his medical emergency.

48.    At 11:15 am on the same morning, Rodriguez's daughter Amanda noticed that he was no longer listed on the jail roster, leading Rodriguez's domestic partner Cary and mother of his children to call the Union County Detention Center. The jail staff then informed Rodriguez's family that he had been released and had *walked out* of the jail.

49.    Indeed, instead of informing his family that Rodriguez had actually been taken to the hospital *by ambulance* due to a *medical emergency*, the jail staff told the family that Rodriguez had dressed himself and walked out of the jail – in an apparent

12

attempt to hide the slipshod and slovenly care that had been inflected upon Rodriguez.

50.     About 11:30 am on June 13, 2022, Eusebio's domestic partner Cary and minor son went to the Union County Detention Center's front desk to ask about Rodriguez's whereabouts, and were once more told by jail staff that they had *seen Rodriguez walk out* of the jail.

51.     Based on this information from jail staff, Rodriguez's family spent the next several hours searching for him across El Dorado. It was only after they called the jail once more that they were informed that Rodriguez had actually been transported *by ambulance* to Medical Center of South Arkansas.

52.      Rodriguez's family arrived at Medical Center of South Arkansas in El Dorado at around 1:00 pm, just in time to see his unresponsive body loaded onto an ambulance helicopter and transported to UAMS in Little Rock, Arkansas.

53.     Due to the fact that Rodriguez did not have health insurance, the emergency staff at Medical Center of South Arkansas did not perform any costly or necessary lifesaving procedures and, instead, did the bare minimum required to prevent Rodriguez from dying while in their care until they could pass him off to UAMS.

54.     Rodriguez's condition was critical and extreme when he was transported to UAMS, and he was near a vegetative state by the time he arrived at UAMS. *See Exhibit I, UAMS Medical Record*.

55.    Rodriguez was in intensive care at UAMS from June 13, 2022, until June 22, 2022. During this time, Rodriguez remained in a near-vegetative state and experienced multiple and painful cardiac arrests -- which led to his eventual death.

## B.    Additional Facts Applicable to the Municipal Defendant (Union County)

56.    Defendant Union County delegated its medical decision-making authority to Turn Key. Despite this, Union County had a continuing and non-delegable duty to ensure that its corporate contractors were meeting the constitutional needs of its detainees. Union County adopted and ratified the policies, customs, and practices of Turn Key as its own. As such, Union County is liable for any unconstitutional corporate policies, customs, or practices of Turn Key that resulted in harm to any detainees and inmates confined in the jail, including the unconstitutional policies, customs, and practices that caused Rodriguez's death. Indeed, it was foreseeable that such policies, customs, or practices would put the lives of Union County Detention Center detainees and inmates at risk, and such policies, customs, or practices caused or substantially contributed to the death of Rodriguez.

57.    Despite several requests, Union County has impeded Rodriguez's family from obtaining his complete post-mortem records from the Arkansas State Medical Examiner's autopsy as well as other reports, and giving them the simple human dignity of knowing what happened to their loved one.

**C.**     **Additional Facts Applicable to the Corporate Defendants (Turn Key)**

58.     Defendant Turn Key engaged in and permitted to exist a pattern, practice, or custom of unconstitutional conduct toward detainees and inmates with serious medical needs, including denying prescription medication and failing to timely secure appropriate medical care for such individuals. As of the time of Rodriguez's detention, there had been numerous instances in the Union County Detention Center (and in other correctional facilities managed by Turn Key) of detainees and inmates being denied prescription medication and deprived of needed medical care by Turn Key and is agents or employees such as failing to conduct meaningful wellness checks, medical checkups, and like Rodriguez not contacting doctors or transporting to the hospital despite serious and obvious medical needs—as evidenced by video footage in this case.

59.     The failure to secure needed medical care for Rodriguez was motivated by constitutionally impermissible profit-driven reasons. Indeed, Turn Key had a policy, practice, and custom of budgeting and spending inadequate amounts on jail medical care to make higher profits on the contract. It was foreseeable that the insufficient jail medical budgeting and spending would cause harm to detainees and inmates in need of medical care.

60.     Turn Key also had a pattern, practice, and custom of failing to properly monitor detainees and inmates with serious medical or mental health needs. Other Turn Key-run facilities have also been written up for similar non-compliance. The Arkansas Commission on Jail Standards cited the Union County

15

Detention Center for failing to comply with the mandated policies for monitoring such detainees shortly after the death of Cynthia Brock, and again approximately one year later. *See also, The Estate of Larry Eugene Price Jr. v. Turn Key Health Clinics, LLC, et al., USDC, Western District of Arkansas, Fort Smith Division, No. 2:23-cv-02008-PKH* (alleging many of the same conduct set forth above in Turn Key's delivery of healthcare at the Sebastian County jail) Moreover, Turn Key has engaged in a pattern of falsifying documents indicating they conducted such checks when they did not.

61.     Turn Key failed to adequately train its personnel on recognizing and responding to the serious medical needs of detainees and inmates. Turn Key also failed to train its corporate nursing staff on how to conduct adequate monitoring and assessments, including the need to conduct basic tests and procedures where indicated. The need for this training was obvious because Turn Key staffed the Union County Detention Center with LPNs, rather than more highly paid RNs, and it was foreseeable that such training deficiencies would cause harm to detainees and inmates.

62.     The corporate policies, practices, and customs described above were the moving force behind Rodriguez's unnecessary and avoidable suffering and death and the constitutional violations alleged herein. Turn Key also ratified the unconstitutional conduct of its employees and agents with respect to the detention and death of Rodriguez. Despite clear video evidence of unconstitutional misconduct, Turn Key approved the constitutionally deficient actions of its medical

16

staff and the unconstitutional conduct of the involved corrections officers.

63.    All acts and omissions committed by Turn Key were committed with intent, malice, or with reckless disregard for Rodriguez's constitutional rights. Moreover, Turn Key either (a) intentionally pursued a course of conduct for the purpose of causing injury, or (b) knew or should have known that its conduct would naturally and probably result in injury or damage and, nevertheless, continued the conduct with malice, deliberate indifference, and reckless disregard of the consequences.

64.    Turn Key had a duty to treat Rodriguez in accordance with the applicable standards of medical and correctional care. Turn Key breached those duties, and Rodriguez's damages, including his pain and suffering, loss of life, death, and other harms and losses were the direct and foreseeable result of the tortious actions and inactions of Turn Key alleged herein.

**D.    Additional Facts Applicable to the Corporate Defendants Medical Center of South Arkansas and Emergency Physicians**

65.    The medical care provided by defendants Medical Center of South Arkansas and Emergency Physicians was deficient to such an extreme degree that the discharge documents produced by that facility state that Rodriguez "was oriented and able to independently bathe himself with little or no assistance," despite the fact that he was air transported away from that facility in a *near vegetative state*. *See Exhibit J, Discharge Narrative from Medical Center of South Arkansas*. Indeed, The Medical Center of South Arkansas and Emergency Physicians were so intent on getting the non-insured Rodriguez out of their care, that simple, basic stabilizing

17

and life-saving care were not given to him (by way of example, only, like timely assessment, treatment, intubation, transfer to a higher level of care, and the like) – that even the Union County Sheriff admitted that he predicted from his past experience with these defendants that Rodriguez would not get proper care and the UAMS internist receiving him was shocked that he was not intubated upon arrival.

66.     The Medical Center of South Arkansas and Emergency Physicians had a duty to treat Rodriguez in accordance with the applicable standards of medical care. The Medical Center of South Arkansas and Emergency Physicians breached that duty, and Rodriguez's damages, including his pain and suffering, loss of life, death, and other harms and losses were the direct and foreseeable result of the tortious actions and inactions of Turn Key alleged herein.

## V. CAUSES OF ACTION

**A.     Against the Municipal Defendant Union County**

### COUNT I
### Deprivation of Civil Rights (*42 U.S.C. § 1983*)

67.     Plaintiffs repeat and re-allege each and every allegation in paragraphs 1 through 66 of this complaint with the same force and effect as if fully set forth herein.

68.     Based on the allegations in this complaint, the Union County is liable under *42 U.S.C. § 1983* for violating the plaintiffs' rights under the *Fourteenth Amendment* to the *United States Constitution*. This includes depriving Rodriguez of his right to adequate and necessary medical care and to be free from cruel and

18

unusual punishment (which caused him avoidable and unnecessary pain and suffering, loss of life, wrongful death, and other harms and losses) as well as depriving plaintiffs and Rodriguez's surviving family members/beneficiaries of their constitutional liberty interest in their relationship and companionship with him and to be free from avoidable and unnecessary mental anguish, loss of consortium, and other harms and losses.

69.     As a direct and proximate result of Union County's actions, Rodriguez suffered great physical pain and emotional distress up to the time of his death, loss of enjoyment of life, loss of life, and other harms, losses, and damages as set forth herein.

70.     Union County knew that failure to provide timely medical treatment to Rodriguez could result in further significant injury and the wanton infliction of pain, but disregarded that serious medical need, causing Rodriguez great bodily harm and death.

## COUNT II
### Wrongful Death and Survival (*A.C.A. §§ 16-62-101 & 102, A.C.A § 16-123-105*)

71.     Plaintiffs repeat and re-allege each and every allegation in paragraphs 1 through 70 of this complaint with the same force and effect as if fully set forth herein.

72.     Based on the allegations set forth in the complaint, Union County is liable under the Arkansas Wrongful Death and Survival laws, *Ark. Code Ann. §§ 16-62-101 & 102*, for tortuously causing the loss of life, death, pre-death pain and suffering, and other harms and losses of Rodriguez by violating the applicable

correctional and medical standards of care and by violating *Article 2 § 8* and *Article 2 § 15* of the *Arkansas Constitution*—giving rise to a claim under the Arkansas Civil Rights Act, *Arkansas Code Ann. § 16-123-105*.

73.     Rodriguez experienced pain and suffering due to the deliberate indifference towards his medical needs in an amount to be proven at trial. This amount is recoverable by the plaintiffs for purposes of Rodriguez's estate.

74.     By reason of the wrongful death of Rodriguez and his family members/beneficiaries incurred mental anguish, loss of consortium, and other harms and losses.

### COUNT III
### Failure to Train and Supervise

75.     Plaintiffs repeat and re-allege each and every allegation in paragraphs 1 through 74 of this complaint with the same force and effect as if fully set forth herein.

76.     Based on the allegations set forth in the complaint, Union County is liable for tortiously violating Rodriguez's constitutional rights under *Fourteenth Amendment* to the *United States Constitution* by failing to train and supervise their jailers, correctional officers, and sheriffs regarding their responsibilities and duties to provide detainees and inmates with adequate medical care.

77.     Union County is liable for tortuously causing the loss of life, death, pre-death pain and suffering, and other harms and losses of Rodriguez through its deliberate indifference towards his medical needs.

B.      **Against the Corporate Defendants Turn Key**

## COUNT IV
### Deprivation of Civil Rights (42 U.S.C. § 1983)

78.     Plaintiffs repeat and re-allege each and every allegation in paragraphs 1 through 77 of this complaint with the same force and effect as if fully set forth herein.

79.     Based on the allegations in this complaint,  Turn Key is liable under *42 U.S.C. § 1983* for violating plaintiffs' rights under the *Due Process Clause* of the *Fourteenth Amendment* to the *United States Constitution* while operating under Color of Law. This includes depriving Rodriguez of his *Fourteenth Amendment* right to adequate medical care and to be free from cruel and unusual punishment (which caused him avoidable and unnecessary pain and suffering, loss of life, wrongful death, and other harms and losses), as well as depriving his surviving family members/beneficiaries of their constitutional liberty interest in their relationship and their society and companionship with him and to be free from avoidable and unnecessary mental anguish, loss of consortium, and other harms and losses.

80.     Rodriguez suffered great physical pain and emotional distress up to the time of his death, loss of enjoyment of life, loss of life, and other harms, losses, and damages as set forth herein.

81.     Turn Key knew that failure to provide Rodriguez with timely medical treatment could result in further significant injury and the unnecessary and wanton infliction of pain, but disregarded that serious medical need, causing Rodriguez great bodily harm and death.

## COUNT V

### Medical Malpractice (Ark. Code Ann. §16-114-201 et seq.)

82.   Plaintiffs repeat and re-allege each and every allegation in paragraphs 1 through 81 of this complaint with the same force and effect as if fully set forth herein.

83.   Turn Key deviated from the acceptable standard of medical and correctional care, and did not apply the skill and learning the law required, in the following respects:

a)   Failure to communicate critical information to a doctor, hospital, and others, including, without limitation, vital signs, symptoms, and substantial changes in condition of Rodriguez;

b)   Failure to recognize, intervene, and prevent the deterioration Rodriguez's health and medical condition;

c)   Failure to timely call an ambulance or other emergency interventions;

d)   Failure to timely transfer Rodriguez to a higher level of care;

e)   Failure to properly follow Rodriguez and prevent the failures and deterioration of Rodriguez as set forth herein;

f)   Failure to provide the necessary care and services and sufficient staff to meet the total needs of Rodriguez on a 24-hour, 7-day a week basis and attain or maintain his highest practicable physical, mental, and psychosocial well-being as determined by timely assessments and an individual plan of care;

g)   Failure of to provide adequate supervision and assistance to prevent the injuries set forth herein;

h)   Failure to protect and promote Rodriguez's right to a safe environment;

i) Failure to adequately assess, evaluate, and supervise the staff to ensure that Rodriguez received appropriate care in accordance with professional standards of quality, facility policy and procedure, and the laws, regulations, and rules applicable to the facility;

j) Failure to provide, implement, and assure an adequate, comprehensive, and accurate care plan based on the needs and functional capacity of Rodriguez that met his physical, mental, and psychosocial needs as identified in a comprehensive assessment with revisions and modifications, as his needs changed;

k) Failure to provide care and treatment to Rodriguez in accordance with his care plan and professional standards of quality, facility policy and procedure, and the laws, regulations, and rules applicable to the facility;

l) Failure to discharge its legal and lawful obligations by assuring that professional standards of quality, facility policy and procedure, and the laws, regulations, and rules applicable to the facility were consistently complied with on an on-going basis, that they remained up-to-date and modified as problems arose, and that appropriate corrective measures were implemented to correct problems concerning inadequate care;

m) Failure to use the degree of skill and care required of it when faced with the conditions of Rodriguez;

n) The failure to maintain accurate medical and other records on Rodriguez in accordance with accepted professional standards that are complete, accurate, timely, and organized, including, at a minimum, documented evidence of safety checks, assessments, the needs of Rodriguez, and the care and services provided;

o) Other failures as set forth in the records, discovery, and deposition testimony taken in this case.

84. A reasonably prudent medical and correctional care provider operating under the same or similar conditions, as well as one following the standards of care as set forth in the *Arkansas Medical Negligence Act* and *AMI 1501* would have provided the care listed above and would have foreseen that the failure to provide

this care would result in devastating injuries and death to Rodriguez Each of the foregoing acts of negligence on the part of Turnkey was a proximate cause of Rodriguez's injuries and death that were foreseeable to them.

85.     Moreover, the training, expertise, and experience of the Medical Center of South Arkansas and Emergency Physicians allowed them to be able to anticipate and know that the lack of proper financial resources for the sufficient supervision, staffing, and supplying of their respective facilities would likely result in injuries to Rodriguez.

86.     Frthermore, Turn Key has vicarious liability for the acts and omissions of all persons or entities under its control either directly or indirectly whose acts or omissions injured Rodriguez including its employees, agents, consultants, medical directors, and independent contractors, whether in-house or outside entities, individuals, agencies, or pools causing or contributing to the injuries of Rodriguez.

## COUNT VI

### Wrongful Death (A.C.A §§ 16-62-101 & 102, A.C.A. § 16-123-105)

87.     Plaintiffs repeat and re-allege each and every allegation in paragraphs 1 through 85 of this complaint with the same force and effect as if fully set forth herein.

84.     Based on the allegations set forth in the complaint, Turn Key is liable under the Arkansas Wrongful Death and Survival laws, *Ark. Code Ann. §§ 16-62-101 & 102*, for tortuously causing the loss of life, death, and pre-death pain and suffering of Rodriguez by violating the applicable correctional and medical

standards of care and by violating *Article 2 § 8* and *Article 2 § 15* of the *Arkansas Constitution*—giving rise to a claim under the Arkansas Civil Rights Act, *Arkansas Code Ann. § 16-123-105*.

85.    Rodriguez experienced pain and suffering due to the deliberate indifference towards his medical needs in an amount to be proven at trial. This amount is recoverable by the plaintiffs for purposes of Rodriguez's estate.

86.    By reason of the wrongful death of Rodriguez and his family members/beneficiaries incurred mental anguish, loss of consortium, and other harms and losses.

<u>**COUNT VII**</u>
**Failure to Train and Supervise**

87.    Plaintiffs repeat and re-allege each and every allegation in paragraphs 1 through 86 of this complaint with the same force and effect as if fully set forth herein.

88.    Based on the allegations set forth in the complaint, Turn Key is liable for tortiously violating Rodriguez's constitutional rights under the *Fourteenth Amendment* to the *United States Constitution* as well as *Article 2 § 8 and Article 2 § 15* of the *Arkansas Constitution* by failing to train and supervise their nurses, doctors, and emergency personnel with regards to their responsibilities and duties to provide detainees with adequate medical care.

89.    Turn Key is liable for tortuously causing the loss of life, death, pre-death pain and suffering, and other harms and losses of Rodriguez through its deliberate indifference towards his medical needs.

25

C.   **Against the Corporate Defendants Medical Center of South Arkansas and Emergency Physicians**

## COUNT VIII

### Medical Malpractice (Ark. Code Ann. §16-114-201 et seq.)

90.   Plaintiffs repeat and re-allege each and every allegation in paragraphs 1 through 89 of this complaint with the same force and effect as if fully set forth herein.

91.   Medical Center of South Arkansas and Emergency Physicians deviated from the acceptable standard of medical and correctional care, and did not apply the skill and learning the law required, in the following respects:

a)   Failure to timely assess, treat, intubation, transfer to a higher level of care;

b)   Failure to communicate critical information to a doctor and others, including, without limitation, vital signs, symptoms, and substantial changes in condition of Rodriguez;

c)   Failure to recognize, intervene, and prevent the deterioration Rodriguez's health and medical condition;

d)   Failure to timely call an air ambulance or other emergency interventions;

e)   Failure to timely transfer Rodriguez to a higher level of care;

f)   Failure to properly follow Rodriguez and prevent the failures and deterioration of Rodriguez as set forth herein;

g)   Failure to provide the necessary care and services and sufficient staff to meet the total needs of Rodriguez on a 24-hour, 7-day a week basis and attain or

maintain his highest practicable physical, mental, and psychosocial well-being as determined by timely assessments and an individual plan of care;

h)   Failure of to provide adequate supervision and assistance to prevent the injuries set forth herein;

i)   Failure to protect and promote Rodriguez's right to a safe environment;

j)   Failure to adequately assess, evaluate, and supervise the staff to ensure that Rodriguez received appropriate care in accordance with professional standards of quality, facility policy and procedure, and the laws, regulations, and rules applicable to the facility;

k)   Failure to provide, implement, and assure an adequate, comprehensive, and accurate care plan based on the needs and functional capacity of Rodriguez that met his physical, mental, and psychosocial needs as identified in a comprehensive assessment with revisions and modifications, as his needs changed;

l)   Failure to provide care and treatment to Rodriguez in accordance with his care plan and professional standards of quality, facility policy and procedure, and the laws, regulations, and rules applicable to the facility;

m)   Failure of the Governing Body to discharge its legal and lawful obligations by assuring that professional standards of quality, facility policy and procedure, and the laws, regulations, and rules applicable to the facility were consistently complied with on an on-going basis, that they remained up-to-date and modified as problems arose, and that appropriate corrective measures were implemented to correct problems concerning inadequate care;

n)   The failure to maintain accurate medical and other records on Rodriguez in accordance with accepted professional standards that are complete, accurate, timely, and organized, including, at a minimum, his true condition upon discharge to UAMS, assessments, the needs of Rodriguez, and the care and services provided;

o)   Failure to use the degree of skill and care required of it when faced with the conditions of Rodriguez;

p)   Other failures as set forth in the records, discovery, and deposition testimony taken in this case.

88.     A reasonably prudent emergency and hospital provider operating under the same or similar conditions, as well as one following the standards of care as set forth in the *Arkansas Medical Negligence Act* and *AMI 1501 and 1504* would have provided the care listed above and would have foreseen that the failure to provide this care would result in devastating injuries and death to Rodriguez Each of the foregoing acts of negligence on the part of Medical Center of South Arkansas and Emergency Physicians was a proximate cause of Rodriguez's injuries and death that were foreseeable to them.

89.     Moreover, the training, expertise, and experience of the Medical Center of South Arkansas and Emergency Physicians allowed them to be able to anticipate and know that the lack of proper financial resources for the sufficient supervision, staffing, and supplying of their respective facilities would likely result in injuries to Rodriguez.

90.     Furthermore, the Medical Center of South Arkansas and Emergency Physicians have vicarious liability for the acts and omissions of all persons or entities under its control either directly or indirectly whose acts or omissions injured Rodriguez including its employees, agents, consultants, medical directors, and independent contractors, whether in-house or outside entities, individuals, agencies, or pools causing or contributing to the injuries of Rodriguez.

91.     Finally, at all relevant times the Medical Center of South Arkansas and Emergency Physicians had among them  (1) an agreement, express or implied; (2) for the common purpose of operating the emergency room and hospital; (3) with a

28

community of pecuniary interest in that purpose; and (4) with an equal right to a voice in the direction and control of the operation of the emergency room and hospital thereby imputing the conduct of each defendant to the other, jointly and severally, under doctrine of joint enterprise as defined by *AMI 712* and other applicable laws.

## COUNT IX

### Wrongful Death (A.C.A §§ 16-62-101 & 102, A.C.A. § 16-123-105)

92.     Plaintiffs repeat and re-allege each and every allegation in paragraphs 1 through 91 of this complaint with the same force and effect as if fully set forth herein.

92.     Based on the allegations set forth in the complaint, the Medical Center of South Arkansas and Emergency Physicians is liable under the Arkansas Wrongful Death and Survival laws, *Ark. Code Ann. §§ 16-62-101 & 102*, for tortuously causing the loss of life, death, and pre-death pain and suffering of Rodriguez by violating the applicable correctional and medical standards  of care and by violating *Article 2 § 8* and *Article 2 § 15* of the *Arkansas Constitution*—giving rise to a claim under the Arkansas Civil Rights Act, *Arkansas Code Ann. § 16-123-105*.

93.     Rodriguez experienced pain and suffering due to the deliberate indifference towards his medical needs in an amount to be proven at trial. This amount is recoverable by the plaintiffs for purposes of Rodriguez's estate.

94.     By reason of the wrongful death of Rodriguez and his family

members/beneficiaries incurred mental anguish, loss of consortium, and other harms and losses.

## VI.   DAMAGES

95.   As a proximate result of the above conduct, plaintiffs are entitled to damages against defendants for medical expenses and costs, pain, suffering, mental anguish, grief, scars and disfigurement, disability, trauma, loss of enjoyment of life, loss of quality of life and personal dignity, humiliation, fright, emotional distress, loss of life, funeral and related expenses, loss of consortium, loss of contributions, death, all elements under *AMI 2216*, and other injuries, damages, harms, and losses as described herein and in the medical records and discovery in this case, in an amount exceeding the minimum amount required for federal court jurisdiction in diversity of citizenship cases.

96.   Moreover, because defendants' conduct was not a mistake and they were on notice of the matters set forth in this complaint, and they knew or should have known, in light of the surrounding circumstances, that their conduct would naturally and probably result in injury, yet they still failed to discharge their responsibilities to Rodriguez and continued their conduct in reckless disregard and with a conscious indifference for his rights and safety causing him to suffer the injuries set forth herein, defendants are liable for punitive damages in an amount exceeding the minimum amount required for federal court jurisdiction in diversity of citizenship cases and sufficient to punish defendants and deter them and others

from similar conduct.

## VII.   JURY DEMAND

97.     Plaintiffs hereby demand a trial by jury.

## VIII. PRAYER FOR RELIEF

Plaintiffs ask that the Court award them the following relief:

A.      All available compensatory damages, including, but not limited to: damages to the decedent for his mental and physical pain and suffering and the loss of the value of his life; damages to his surviving family members for their loss of society and companionship, loss of love and affection, loss of household services, and loss of care, comfort, and guidance; and all compensatory damages available under state and federal law;

B.      Punitive damages against all defendants;

C.      Attorneys' fees and costs;

D.      Prejudgment interest as appropriate; and

E.      Any such other relief that this Court deems just and equitable.

**Dated  this 20th day of January, 2023.**

Respectfully submitted,

M. Darren O'Quinn, AR Bar No. 87-125
**LAW OFFICES OF DARREN O'QUINN PLLC**
B. Ram Suri Professional Building
36 Rahling Circle, Suite 4
Little Rock, AR 72223
Phone: (501) 817-3124
Fax: (501) 817-3128
Email: Darren@DarrenOQuinn.com

And

Angela Galvis Schnuerle, ABA #2004196
Attorney for Plaintiff
GALVIS LAW, PLLC
5523 JFK Blvd.
North Little Rock, AR 72205
Phone: (501) 220-1116
Email: angie@galvis.legal