## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF ARKANSAS
## EL DORADO DIVISION

| | | |
|---|---|---|
| **Estate of Eusebio Castillo Rodriguez, Deceased, by its Special Co-Administratrices, Amanda Castillo and Cary Rios, on behalf of the Estate and Its Wrongful Death Beneficiaries** | § § § § § § | |
| **Plaintiffs,** | § § | **Case 1:23-cv-01006-SOH** |
| **v.** | § § | **JURY TRIAL DEMANDED** |
| **Union County, Arkansas; Association of Arkansas Counties Risk Management Fund; Sheriff Rickey Roberts; Captain Richard Mitcham; Sgt. Joseph Walka; Sgt. Jedidiah Cotton; Correctional Officer Demario Freeman; Sgt. John Ward; Turn Key Health Clinics LLC; Turn Key Health Medical Arkansas, PLLC; Harley West, LPN; Kasie Sanford, LPN; and Deanna Hopson, M.D.** | § § § § § § § § § § § § § | |
| **Defendants.** | § | |

**PLAINTIFFS' THIRD AMENDED COMPLAINT**

## TABLE OF CONTENTS

Table of Authorities .................................................................................................. ii

Introduction ............................................................................................................. 1

Jurisdiction and Venue ........................................................................................... 1

Parties ...................................................................................................................... 2

Factual Allegations ................................................................................................. 6

Causes of Action .................................................................................................... 20

Damages .................................................................................................................. 39

Jury Demand ........................................................................................................... 40

Prayer for Relief ..................................................................................................... 40

i

# TABLE OF AUTHORITIES

## STATUTES, RULES, AND AMI

42 U.S.C. § 1983……………………………………………………1, 3, 5, 20, 21, 26

28 U.S.C. § 1341…………………………………………………………………………1

28 U.S.C. § 1343…………………………………………………………………………2

28 U.S.C. § 1367(a) ……………………………………………………………………2

28 U.S.C. § 1391(3) ……………………………………………………………………2

Ark. Code Ann. § 16-62-101………………………………………………………25, 38

Ark. Code Ann. §16-62-102………………………………………………………25, 38

Ark. Code Ann. § 16-114-201…………………………………………………….……28

Ark. Code Ann. § 16-123-105…………………………………………3, 5, 19, 20, 24, 25, 29

Ark. Code Ann. § 23-79-210……………………………………………………………4

Fed.R.Civ.P. 8…………………………………………………………………………20

AMI (CIVIL) 302………………………………………………………………………24

AMI (CIVIL) 401………………………………………………………………………24, 37

AMI (CIVIL) 1501……………………………………………………………………...36

AMI (CIVIL) 2216……………………………………………………………………...39

## CONSTITUTIONAL PROVISIONS

U.S. CONST. amend. VIII………………………………………………………………20

U.S. CONST. amend. XIV………………………………………………1, 3, 18, 21, 26

Ark. CONST. art. 2 § 8…………………………………………………………… 23, 28

Ark. CONST. art. 2 § 15………………………………………………………… 23, 28

**CASES**

*Ashcroft v. Iqbal*, 556 U. S. 662 (2009)……………………………………………………20

*Bell Atlantic Corp. v. Twombly*, 550 U. S. 544, 569-70 (2007)…………………………20

*Brewington v. Keener*, 902 F.3d 796 (8th Cir. 2018)………………………………………21

*Estate of Larry Eugene Price Jr. v. Turn Key Health Clinics, LLC, et al., USDC, Western District of Arkansas, Fort Smith Division, No. 2:23-cv-02008-PKH*………..18

*Estelle v. Gamble*, 429 U.S. 97 (1976)……………………………………………………...21

*Johnson v. City of Shelby*, 574 U.S. 10 (2014)……………………………………………20

*Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 690 (1978)………………………………21

Plaintiffs, Amanda Castillo and Cary Rios, by their attorneys, The Law Offices of Darren O'Quinn, PLLC and Galvis Law, PLLC, for their complaint, state:

## I.      Introduction

1.       This is a civil rights action under *42 U.S.C. § 1983* and the laws of the state of Arkansas resulting from events that happened during and immediately after the detention of Eusebio Castillo Rodriguez ("Rodriguez") at the Union County Detention Center, which sits in Union County, Arkansas and whose medical care is subcontracted to private, for-profit correctional limited liability companies, Turn Key Health Clinics LLC and Turn Key Health Medical Arkansas, PLLC.

2.       The events that give rise to this complaint began on Wednesday, June 8, 2022, and culminated in the unnecessary and avoidable death of Rodriguez on Wednesday, June 22, 2022. Defendants caused Rodriguez's death by violating his rights under the *Fourteenth Amendment* to the *United States Constitution* and under the laws of the state of Arkansas.

3.       Defendants' unlawful actions include depriving Rodriguez of adequate medical care, ignoring his ongoing serious medical needs, including his obvious acute distress, failing to monitor and assess him despite his severe and life-threatening medical condition, otherwise forcing him to endure extreme and needless pain and suffering, and causing his death.

## II.      Jurisdiction and Venue

4.       This Court has original subject matter jurisdiction over the plaintiffs' civil rights claims under *42 U.S.C. § 1983*, pursuant to *28 U.S.C. § 1331* (federal

question) and *28 U.S.C. § 1343* (civil rights). This Court has supplemental jurisdiction over the plaintiffs' related state claims pursuant to *28 U.S.C. § 1367(a)*.

5.      This Court has personal jurisdiction over each of the named defendants because they either (1) reside in this judicial district, or (2) they have sufficient minimum contacts in the state of Arkansas, and the exercise of personal jurisdiction would not offend traditional notions of fair play and substantial justice.

6.      Venue is proper in this jurisdiction under *28 U.S.C. § 1391(3)* because all defendants are subject to this Court's personal jurisdiction in this action.

### III.      Parties

### A.      Plaintiffs

7.      Plaintiff, Amanda Castillo, is a resident of El Dorado, Arkansas. Amanda Castillo is the daughter of the decedent, Eusebio Castillo Rodriguez. She is also one of the special co-administratrices of the Estate of Eusebio Castillo Rodriguez, which was duly formed under Arkansas law in the Union County Circuit Court, Probate Division, No. 70PR-22-180. Amanda Castillo is a plaintiff in her capacity as the personal representative of her late father's estate and for the benefit of all statutory beneficiaries.

8.      Plaintiff, Cary Rios, is a resident of El Dorado Arkansas. Cary Rios was the domestic partner of the decedent, Eusebio Castillo Rodriguez, and the mother of Eusebio's three children, including two minor children. She is also one of the special co-administratrices of the Estate of Eusebio Castillo Rodriguez, which was duly formed under Arkansas law in the Union County Circuit Court, Probate Division, No.

70PR-22-180. Cary Rios is a plaintiff in her capacity as the personal representative of her late domestic partner's estate and for the benefit of all statutory beneficiaries.

### B.  Defendants

### The Municipal Defendants

9.  Defendant Union County, Arkansas ("Union County") is a governmental entity and a political subdivision of the state of Arkansas and is a "person" for purposes of *42 U.S.C. § 1983* and *Ark. Code. Ann. § 16-123-105*. Union County is responsible for operating the Union County Detention Center, which sits in Union County, Arkansas. The Union County Detention Center houses pretrial detainees and convicted inmates. All detainees confined at the Union County Detention Center are entitled to constitutional protections under the *Fourteenth Amendment* to the *United States Constitution*, including the right to constitutionally adequate medical care and the right to be free from constitutionally cruel and unusual punishment (unacceptable due to the suffering, pain, or humiliation it inflicts on the person subjected to the sanction). Union County has a non-delegable duty to ensure that the Union County Detention Center meets such constitutional requirements. Union County may be served via its County Judge, the Honorable Mike Loftin, at 101 North Washington, Room 101, El Dorado, Arkansas 71730.

10.  Defendant the Association of Arkansas Counties Risk Management Fund ("AACRMF") is a multi-county, self-funded insurance trust of Arkansas counties formed for legal services, including defense and financial protection when

3

its participating counties have been sued, including defendant Union County. AACRMF is a citizen of the state of Arkansas. To the extent defendant Union County claims and is entitled to immunity, AACRMF, who at all relevant times was a liability insurance carrier, self-insurance fund, pooled liability fund, or similar fund maintained by defendant Union County doing business in Union County, Arkansas, and who insures/indemnifies defendant Union County for claims such as those made in the lawsuit is named as a party and liable for the actions of defendant Union County pursuant to *Ark. Code Ann. § 23-79-210*. AACRMF may be served via it Executive Director, Chris Villines, at its Administrative Office is located at 1415 W 3rd St, Little Rock, AR 72201.

11.     Beginning on August 1, 2021, and ending on July 31, 2022, Union County contracted with a private, for-profit correctional corporation, known as Turn Key Health Clinics LLC and Turn Key Health Medical Arkansas, PLLC (collectively "Turn Key"), to supply, coordinate, and manage the health care delivery system at Union County Detention Center, including the provision of medical care to the jail's population of pretrial detainees and post-conviction prisoners. The contract between Union County and Turn Key was extended on July 28, 2022, to cover the time period of August 1, 2022, to December 31, 2022. *See Exhibit A, Turn Key Contract.*

12.     Although Union County sought to privatize the operation of its jail's medical care by delegating its day-to-day decisions and medical policy-making authority to Turn Key, Union County cannot contract away its non-delegable constitutional obligations and is liable for any unconstitutional Turn Key corporate

policies, customs, or procedures that resulted in harm to any detainees and inmates confined in the jail.

13.     Defendants Union County Sheriff Ricky Roberts, Captain Richard Mitcham, Sgt. Joseph Walka, Sgt. Jedidiah Cotton, Correctional Officer Demario Freeman, and Sgt. John Ward are citizens of the state of Arkansas residing and employed in Union County, Arkansas with Union County and its detention center who were involved in the incarceration, care, treatment, and supervision of Rodriguez. All these separate defendants' actions or inactions were taken under the color of state law, and they are sued in their individual capacities – except for Sheriff Roberts who is being sued in his individual *and* official capacity. Union County has vicarious liability for any actions or inactions of these separate defendants.

### The Corporate Defendants

14.     Defendants Turn Key Health Clinics LLC and Turn Key Health Medical Arkansas, PLLC (collectively "Turn Key"), are foreign for-profit correctional care limited liability companies doing business in this judicial district that are organized and existing under the laws of the state of Oklahoma. Turn Key is considered a "person" under *42 U.S.C. § 1983* and *Ark. Code. Ann. § 16-123-105*. Turn Key coordinates the medical operations of the Union County Detention Center including that for the Union County Detention Center's detainees and inmates. Turn Key is a medical decision-maker for Union County for purposes of providing jail-related services and meeting the needs of its pretrial detainees and convicted inmates. Turn Key is authorized to do business and conducts business in this judicial

5

district. According to the Arkansas Secretary of State, Turn Key Health Clinics LLC's registered agent for service is CT Corporation System, 124 West Capitol Avenue, Little Rock, Arkansas 72201 and Turn Key Health Medical Arkansas, PLLC's registered agent for service is Incorp Services, Inc., 4250 Venetian Lane, Fayetteville, Arkansas 72703, respectively. At all material times, Turn Key was acting under color of state law.

15.     Defendants Harley West, LPN, Kasie Sanford, LPN, and Deanna Hopson, M.D. are citizens of the state of Arkansas residing and employed in Union County, Arkansas with Turn Key who were involved in the incarceration, care, treatment, and supervision of Rodriguez. All these separate defendants' actions or inactions were taken under the color of state law, and they are sued in their individual capacities. Moreover, since they were acting in the course and scope of their employment/agency, Turn Key has vicarious liability for any actions or inactions of these separate defendants.

## IV.     Factual Allegations

### A.     Facts Applicable to All Defendants

16.     Eusebio Castillo Rodriguez ("Rodriguez") is a Hispanic male who died on June 22, 2022, at the age of forty-two years.

17.     On July 27, 2022, a Petition to Appoint a Special Administrator was filed in Union County Circuit Court, Probate Division, Case No. 70PR-22-180 and was granted on August 31, 2022.

6

18.    Rodriguez was survived by three children: Amanda Castillo (the co-administratrix of his estate) and two minor children, namely JCC and NR.

19.    Rodriguez was arrested on April 27, 2022, and charged with driving while intoxicated, driving with a suspended license, and having an open container of alcohol in his vehicle. Rodriguez was released that same day from the Union County Detention Center on his own recognizance to his daughter Amanda.

20.    Rodriguez  appeared before the Union County District Court on June 6, 2022, however, there was no interpreter present, so the Court reset his court date to June 8, 2022. *See Exhibit B, Docket Report.*

21.    Rodriguez again appeared in the Union County District Court on June 8, 2022, for his sentencing hearing. An interpreter was present at the hearing through a speaker phone. *See Exhibit C, AOC Interpreter Docket.*

22.    The Union County District Court's record indicates that Rodriguez appeared without counsel, waived the right to a public defender, and pled guilty to all counts.

23.    The Union County District Court's record further indicates that Judge Jack Barker suspended the one-year jail time for Rodriguez's DWI charge and the ten-day jail sentence for the charge of driving with a suspended license. The suspension of both sentences was conditioned on Rodriguez's compliance with the court's orders.

24.    At the end of the hearing, Judge Barker asked Rodriguez if he had any questions. Rodriguez responded in Spanish, stating: "I have seen many cars drive

over the traffic lines because the driver was drunk, and the police haven't done anything, except for me because I am Mexican." *See Exhibit D, Partial Transcript of June 13, 2022 – DWI-22-19.*

25.     Instead of properly interpreting Rodriguez's words to the Court, however, the interpreter delivered this mistranslation: "So, I am not really understanding why there are so many different charges. I wasn't that drunk, and I just feel like the police were following me."

26.     Frustrated by what the interpreter's mistranslation led him to believe Rodriguez's statements were, Judge Barker chose to reinstate the previously suspended ten-day jail sentence for driving without a license -- resulting Rodriguez being taken into custody on the spot and immediately transported to the Union County Detention Center for intake.

27.     Due to the fact that Rodriguez suffered from several non-life-threatening health concerns, such as diabetes, hypertension, and high-blood pressure, Rodriguez's daughter Amanda immediately informed the Union County Detention Center of Rodriguez's medical conditions and subsequently brought his medications to the jail. *See Exhibit E, Castillo Medical Intake June 9, 2022.*

28.     On Wednesday, June 8, 2022, at 1501 hours Rodriguez was booked into the Union County Detention Center. Despite knowledge of his medical conditions, he was not even assessed/screened for the first 26 hours that he was incarcerated.

29.     When Rodriguez did finally receive an intake screening 26 hours after his arrest, he was already experiencing significant alcohol withdrawal symptoms –

and Turn Key documented this fact and knew it could develop into a life-threatening medical condition if not monitored serially and an appropriate plan put into place to treat it and prevent it from progressing.

30.    While both Nurse Sanford and Nurse West at least charted that they serially monitored Rodriguez and watched his condition <u>deteriorate right before their eyes</u>, he never even received the first-line of defense for withdrawal treatment – a simple benzodiazepine medication regimen. Indeed, Dr. Hopson did not prescribe <u>any</u> medication which would be expected to have <u>any</u> effect at all on the severity of the alcohol withdrawal syndrome or its course. Her orders were tantamount to leaving Rodriquez's alcohol withdrawal syndrome completely untreated.

31.    Rodriguez was initially held in a group booking cell with other inmates until about 2:40 pm on Friday, June 10, 2022, when he was moved to "pod-H," a general population cell block within the Union County Detention Center.

32.    Rodriguez's family visited him by video-call on the afternoon on June 10, 2022. During this visit, his family noticed and was alarmed that Rodriguez was shaking severely, appeared to be disoriented, and displayed several other symptoms of alcohol withdrawal.

33.    Without any knowledge of the ultimately fatal condition Rodriguez was developing while in the Union County Detention Center, his family made a second report to the Union County Sherriff's Office detailing their concerns for his health.

34.    The Union County contract with Turn Key provides the Union County Detention Center with two LPN nurses working on twelve-hour shifts to ensure that

9

one is onsite at all times during the week, and are on-call during the weekends. The nurse's station is located in the same wing of the jail where Rodriguez was housed.

35.     The nurses and guards were aware of Rodriguez's pre-existing conditions as he continued to deteriorate over the course of his approximately five-day incarceration in the Union County Detention Center, especially as his health began to rapidly decline over the weekend, yet did nothing to assess, intervene, or treat his symptoms -- and at no time attempted to report his significant change in condition to a doctor or recommend that Rodriguez be transported to the hospital.

36.     Rodriguez's symptoms and time course are completely consistent with the progression of the untreated alcohol withdrawal syndrome. His worsening was entirely foreseeable and was more likely than not preventable had he received appropriate treatment.

37.     As Rodriguez's withdrawal symptoms continued to worsen, he attempted to communicate with the guards, trying to make them aware of the severity of his condition, and  asking them to get him medical help beyond the nurses' cursory efforts, but was essentially ignored due to the language barrier and the guards' indifference. Although the guards had access to a translation application, which would have facilitated communication with Rodriguez, they instead tried to speak to him in English and made no effort to understand his responses.

38.     The amount of pain and discomfort that Rodriguez was suffering due to his increasingly severe withdrawal symptoms became so intense that at midnight on

10

Saturday, June 12, 2022, he was removed from pod-H because he was moaning and making it difficult for other inmates to sleep.

39.     Rodriguez was moved to a booking cell reserved for solitary confinement.

40.     Although nurses continued to perfunctorily monitor Rodriguez's vital signs, they at no point attempted to engage in any meaningful communication regarding his mental state and medical condition, and at no point recommended he be seen by a more qualified medical professional or taken to the hospital.

41.     Predictably, at roughly 8:30 pm on Sunday, June 12, 2022, a guard saw Rodriguez hunched over in pain through the window in the solitary cell, but did nothing to help him, and did not even report his condition to the nursing staff. *See Exhibit F, Screenshot of Body Camera Video.*

42.     This indifference to Rodriguez continued as the officers on duty in the early morning hours of Sunday, June 12, 2022, including Sgt. Walka and Sgt. Cotton knew that Rodriguez was suffering from acute alcohol withdrawal and, as trained correctional officers, would have known that acute alcohol withdrawal is a serious and potentially fatal medical condition. There was no nurse on duty in the overnight hours and they should have contacted the on-call medical provider for instructions or referred Rodriguez to a hospital for treatment. They did not.

43.     Rodriguez was found half-naked, incoherent, and trembling severely while lying face down on the floor of his solitary cell at roughly 5:15 am on Monday, June 13, 2022. *See Exhibit G, Affidavit of Sgt. Walka.*

44.     Officers on duty on the morning of Monday, June 13, 2022, including Sgt. Walka, CO Freeman, and Sgt. Ward all interacted with Rodriguez when he was unresponsive, unable to respond, and clearly having a medical emergency - which would be obvious to even a layperson. Rather than calling an ambulance or summoning emergency aid for Rodriguez, they stood by while he was being "processed for release" from custody (so Union County would not have to pay for the emergency transfer of a "detainee in custody") and wasted valuable time during a medical emergency until he could be "hoisted" into a car so that he could be dropped off at the hospital with no apparent concern for his well-being and without taking any responsibility for the serious medical condition which developed directly as a result of their lack of medical care.

45.     As concerning or possibly more so, is Nurse Sanford's actions on the morning of 6/13/2022. Nurse Sanford saw and assessed Rodriguez inside the detention center when he was clearly unresponsive and having a medical emergency. Any reasonable nurse, and even a non-medically trained layperson, would be able to detect that Rodriquez was suffering from a medical emergency and that an ambulance needed to be called. Instead, she (and the correctional officers discussed above) stood by while Rodriguez was released from custody and was prepared for a routine transport to the hospital in a custody car. She disregarded what should have been clearly apparent to be a serious medical need.

46.     While there are alleged "wellness check" records for June 11, June 12, and June 13, 2022, there is only one bodycam recording of such purported checks.

47.     Additionally, the solitary confinement cell had visible camaras, which recorded the severe decline in Rodriguez's health; however, Union County initially did not provide that footage when it was requested despite numerous attempts by plaintiffs to get it (leading to the question of possible spoilation of evidence).

48.     In any event, Turn Key employee Kasey Sanford, LPN did not arrive for her shift until 7:56 am on Monday, June 13, 2022.

49.     During the two hours and forty-one minutes from when Rodriguez was discovered lying face down on the floor of his solitary cell until this nurse arrived for her shift, there were no attempts by the guards to check on Rodriguez's condition or render assistance including Sgt. Walka, CO Freeman, and Sgt. Ward who all interacted with Mr. Rodriguez when he was unresponsive. Further, the guards continued to mark Rodriguez as "OK" on their wellness checks for the entirety of that time period.

50.     Mercifully, once the nurse arrived in the facility, the guards finally lifted Rodriguez off the ground, dressed him, and at least placed him in a wheelchair in order to transport him to the nurse's station.

51.     Over the course of the next hour, the jail staff transported Rodriguez's unconscious body to the nurse's station and then back to the booking cell, where the guards changed him out of his jail uniform and into his civilian clothing. He was then wheeled out of the jail and placed into a police vehicle, which they originally intended to use to transport him to the Medical Center of South Arkansas.

52.     During this time, Sheriff Rickey Roberts, Captain Richard Mitcham, the Union County Detention Center's administrator, managed to procure Judge Jack Barker's signature, releasing Rodriguez from the custody of the Union County Detention Center via a Speed Letter due to a "medical condition" in order to avoid being held liable for the costs of Rodriguez's medical treatment. *See Exhibit H, Speed Letter*.

53.     Once released from their custody, the jail staff and nurses for Turn Key only then chose to call an ambulance, which arrived at about 9:00 am and transported Rodriguez to the Medical Center of South Arkansas. – **this was almost four hours after Rodriguez had been found half-naked, incoherent, and trembling severely while lying face down on the floor of his solitary cell at roughly 5:15 am.**

54.     At no point was Rodriguez's family informed of his medical emergency.

55.     In fact, at 11:15 am on the same morning, Rodriguez's daughter Amanda noticed that he was no longer listed on the jail roster, leading Rodriguez's domestic partner Cary and mother of his children to call the Union County Detention Center. The jail staff then informed Rodriguez's family that he had been released and had *walked out* of the jail.

56.     Indeed, instead of informing his family that Rodriguez had actually been taken to the hospital *by ambulance* due to a *medical emergency*, the jail staff at the direction of Sheriff Roberts and Captain Mitcham, told the family that he had dressed

himself and walked out of the jail – in an apparent attempt to hide the slipshod and slovenly care that had been inflicted upon Rodriguez.

57.      About 11:30 am on June 13, 2022, Eusebio's domestic partner Cary and minor son went to the Union County Detention Center's front desk to ask about Rodriguez's whereabouts, and were once more told by jail staff that they had *seen Rodriguez walk out* of the jail.

58.      It is a fact that, and even though he did walk into the jail,  Rodriguez did <u>not</u> walk out of the Union County Detention Center, as evidenced by his condition just  a short time after being "released:"



59.      Based on this information from jail staff, Rodriguez's family spent the next several hours searching for him across El Dorado. It was only after they called the jail once more that they were informed that Rodriguez had actually been transported *by ambulance* to Medical Center of South Arkansas.

60.     Rodriguez's family arrived at Medical Center of South Arkansas in El Dorado at around 1:00 pm, just in time to see his unresponsive body loaded onto an ambulance helicopter and transported to UAMS in Little Rock, Arkansas.

61.     Rodriguez's condition was critical and extreme when he was transported to UAMS, and he was near a vegetative state by the time he arrived at UAMS. *See Exhibit I, UAMS Medical Record*

62.     Rodriguez was in intensive care at UAMS from June 13, 2022, until June 22, 2022. During this time, Rodriguez remained in a near-vegetative state and experienced multiple and painful cardiac arrests -- which led to his eventual death.

## B.     Additional Facts Applicable to the Municipal Defendant (Union County)

63.     Defendant Union County delegated its medical decision-making authority to Turn Key. Despite this, Union County had a continuing and non-delegable duty to ensure that its corporate contractors were meeting the constitutional needs of its detainees. Union County adopted and ratified the policies, customs, and practices of Turn Key as its own. As such, Union County is liable for any unconstitutional corporate policies, customs, or practices of Turn Key that resulted in harm to any detainees and inmates confined in the jail, including the unconstitutional policies, customs, and practices that caused Rodriguez's death. Indeed, it was foreseeable that such policies, customs, or practices would put the lives of Union County Detention Center detainees and inmates at risk, and such policies, customs, or practices caused or substantially contributed to the death of Rodriguez -

16

and the failure to secure needed medical care for Rodriguez was motivated by constitutionally impermissible budget-driven reasons.

64. Despite several requests, Union County initially impeded Rodriguez's family from obtaining his complete post-mortem records from the Arkansas State Medical Examiner's autopsy as well as other reports and giving them the simple human dignity of knowing what happened to their loved one.

65. All acts and omissions committed by Union County employees/agents as described were committed with intent, malice, or with reckless disregard for Rodriguez's constitutional rights. Moreover, these employees either (a) intentionally pursued a course of conduct for the purpose of causing injury, or (b) knew or should have known that their conduct would naturally and probably result in injury or damage and, nevertheless, continued the conduct with malice, deliberate indifference, and reckless disregard of the consequences.

## C. Additional Facts Applicable to the Corporate Defendants (Turn Key)

66. Defendant Turn Key engaged in and permitted to exist a pattern, practice, or custom of unconstitutional conduct toward detainees and inmates with serious medical needs, including denying prescription medication and failing to timely secure appropriate medical care for such individuals. As of the time of Rodriguez's detention, there had been numerous instances in the Union County Detention Center (and in other correctional facilities managed by Turn Key) of detainees and inmates being denied prescription medication and deprived of needed medical care by Turn Key and its agents or employees such as failing to conduct

17

meaningful wellness checks, medical checkups, and like Rodriguez not contacting doctors or transporting to the hospital despite serious and obvious medical needs—as evidenced by video footage in this case.

67.     The failure to secure needed medical care for Rodriguez was motivated by constitutionally impermissible profit-driven reasons. Indeed, Turn Key had a policy, practice, and custom of budgeting and spending inadequate amounts on jail medical care to make higher profits on the contract. It was foreseeable that the insufficient jail medical budgeting and spending would cause harm to detainees and inmates in need of medical care.

68.     Turn Key also had a pattern, practice, and custom of failing to properly monitor detainees and inmates with serious medical or mental health needs. Other Turn Key-run facilities have also been written up for similar non-compliance. The Arkansas Commission on Jail Standards cited the Union County Detention Center for failing to comply with the mandated policies for monitoring such detainees shortly after the death of Cynthia Brock, and again approximately one year later. *See also, The Estate of Larry Eugene Price Jr. v. Turn Key Health Clinics, LLC, et al., USDC, Western District of Arkansas, Fort Smith Division, No. 2:23-cv-02008-PKH* (alleging much of the same conduct set forth above in Turn Key's delivery of healthcare at the Sebastian County jail) Moreover, Turn Key has engaged in a pattern of falsifying documents indicating they conducted such checks when they did not.

69.     Turn Key failed to adequately train its personnel on recognizing and responding to the serious medical needs of detainees and inmates. Turn Key also

failed to train its corporate nursing staff on how to conduct adequate monitoring and assessments, including the need to conduct basic tests and procedures where indicated. The need for this training was obvious because Turn Key staffed the Union County Detention Center with LPNs, rather than more highly paid RNs, and it was foreseeable that such training deficiencies would cause harm to detainees and inmates.

70.     The corporate policies, practices, and customs described above were the moving force behind Rodriguez's unnecessary and avoidable suffering and death and the constitutional violations alleged herein. Turn Key also ratified the unconstitutional conduct of its employees and agents with respect to the detention and death of Rodriguez. Despite clear video evidence of unconstitutional misconduct, Turn Key approved the constitutionally deficient actions of its medical staff and the unconstitutional conduct of the involved corrections officers.

71.     All acts and omissions committed by Turn Key and its employees/agents were committed with intent, malice, or with reckless disregard for Rodriguez's constitutional rights. Moreover, Turn Key either (a) intentionally pursued a course of conduct for the purpose of causing injury, or (b) knew or should have known that their conduct would naturally and probably result in injury or damage and, nevertheless, continued the conduct with malice, deliberate indifference, and reckless disregard of the consequences.

72.     Turn Key had a duty to treat Rodriguez in accordance with the applicable standards of medical and correctional care. Turn Key breached those

duties, and Rodriguez's damages, including his pain and suffering, loss of life, death, and other harms and losses were the direct and foreseeable result of the tortious actions and inactions of Turn Key alleged herein.

## V. CAUSES OF ACTION[1]

**A.      Against the Municipal Defendant Union County and Its Employees**

### Count I
### Deprivation of Civil Rights (*42 U.S.C. § 1983*)

73.      Plaintiffs repeat and re-allege each and every allegation in paragraphs 1 through 72 of this complaint with the same force and effect as if fully set forth herein.

74.      *42 U.S.C. § 1983* authorizes lawsuits against law enforcement officers who violate constitutional rights while acting under color of state law.

75.      The *Eight Amendment*, applicable to the states through the *Fourteenth Amendment*, protects prisoners from "cruel and unusual punishment." *See U.S.*

---

[1] In a Complaint, a plaintiff is only required to plead facts, not legal theories. *See Johnson v. City of Shelby*, 574 U.S. 10 (2014) (Per Curiam) (reversing Fifth Circuit and holding that only facts need to be pled in a complaint, not legal theories). A plaintiff is only required to plead "enough facts to state a claim to relief that is plausible on its face." *Bell Atlantic Corp. v. Twombly*, 550 U. S. 544, 569-70 (2007); *Ashcroft v. Iqbal*, 556 U. S. 662 (2009). A plaintiff need only provide "a short and plain statement of the claim showing that the pleader is entitled to relief." *Fed.R.Civ.P. 8(a)(2)*. "Each allegation must be simple, concise, and direct. No technical form is required." *Fed.R.Civ.P. 8(d)(1)*.

*Const. amend. VIII* ("excessive bail shall not be required, nor excessive fines imposed, nor cruel and unusual punishments inflicted.").

76.     In 1976, the Supreme Court said in *Estelle v. Gamble*, 429 U.S. 97 (1976) that a prison staff's "deliberate indifference" to the "serious medical needs" of prisoners is "cruel and unusual punishment" forbidden by the *Eight Amendment*.

77.     Based on the allegations in this complaint, and specifically including those in paragraph 106(o) *infra* and by way of example only, Union County and separate defendants Sheriff Ricky Roberts[2], Captain Richard Mitcham, Sgt. Joseph Walka, Sgt. Jedidiah Cotton, Correctional Officer Demario Freeman, and Sgt. John Ward are liable under *42 U.S.C. § 1983* for violating the plaintiffs' rights under the *Fourteenth Amendment* to the *United States Constitution*. This includes depriving

---

[2] Union County Sheriff Ricky Roberts has been sued in both his individual and official capacities. One of his liabilities in this case is *supervisor liability*, which can attach to either or both or his capacities (*i.e.* liability when the supervisor personally participates in the alleged constitutional violation or when there is a causal connection between the actions of the supervisor and the alleged constitutional violation) for disregarding the known risks to Rodriguez and knowingly failing to supervise and train his deputies and correctional officers. A lawsuit filed against a government official in his official capacity is the same as a lawsuit against the employing public entity; in this case, Union County, Arkansas. "Local governing bodies . . . can be sued directly under § 1983 for monetary, declaratory, or injunctive relief where . . . the action that is alleged to be unconstitutional implements or executes a policy statement, ordinance, regulation, or decision officially adopted and promulgated by that body's officers." *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 690 (1978). During all relevant times, Captain Richard Mitcham, Sgt. Joseph Walka, Sgt. Jedidiah Cotton, Correctional Officer Demario Freeman, and Sgt. John Ward were acting pursuant to the c u s t o m s , policies, and procedures of Sheriff Roberts. An unconstitutional government policy may be inferred from a <u>single decision</u> taken by the highest officials responsible for setting policy in that area of the government's business. *See Brewington v. Keener*, 902 F.3d 796 (8th Cir. 2018).

Rodriguez of his right to adequate and necessary medical care and to be free from cruel and unusual punishment (which caused him avoidable and unnecessary pain and suffering, loss of life, wrongful death, and other harms and losses) as well as depriving plaintiffs and Rodriguez's surviving family members/beneficiaries of their constitutional liberty interest in their relationship and companionship with him and to be free from avoidable and unnecessary mental anguish, loss of consortium, and other harms and losses.

78.    Union County and these separate defendants knew that failure to provide timely medical treatment to Rodriguez could result in further significant injury and the wanton infliction of pain, but disregarded that serious medical need, causing Rodriguez great bodily harm and death.

79.    As a direct and proximate result of Union County and these separate defendants' actions, Rodriguez suffered great physical pain and emotional distress up to the time of his death, loss of enjoyment of life, loss of life, and other harms, losses, and damages as set forth herein, and have and will incur attorney fees and litigation costs.

### Count II
### Violation of the Arkansas Civil Rights Act
### (*Ark. Code. Ann. § 16-123-105*)

80.    Plaintiffs repeat and re-allege each and every allegation in paragraphs 1 through 79 of this complaint with the same force and effect as if fully set forth herein.

81.     Based on the allegations set forth in the complaint, Union County and separate defendants Sheriff Ricky Roberts, Captain Richard Mitcham, Sgt. Joseph Walka, Sgt. Jedidiah Cotton, Correctional Officer Demario Freeman, and Sgt. John Ward are liable for tortiously causing the loss of life, death, pre-death pain and suffering, and other harms and losses of Rodriguez by violating the applicable correctional and medical standards of care and by violating *Article 2 § 8* and *Article 2 § 15* of the *Arkansas Constitution*—giving rise to a claim under the Arkansas Civil Rights Act, *Arkansas Code Ann. § 16-123-105*.

82.     Union County and these separate defendants caused Rodriguez to experience pain and suffering due to the deliberate indifference towards his medical needs in an amount to be proven at trial. This amount is recoverable by the plaintiffs for purposes of Rodriguez's estate.

83.     As a direct and proximate result of Union County and these separate defendants' conduct, Rodriguez and his family members/beneficiaries incurred mental anguish, loss of consortium, and other harms and losses, and have and will incur attorney fees and litigation costs.

### Count III
### Negligence

84.     Plaintiffs repeat and re-allege each and every allegation in paragraphs 1 through 83 of this complaint with the same force and effect as if fully set forth herein.

85.     Based on the allegations set forth in the complaint, Union County and separate defendants Sheriff Ricky Roberts, Captain Richard Mitcham, Sgt. Joseph

Walka, Sgt. Jedidiah Cotton, Correctional Officer Demario Freeman, and Sgt. John Ward are liable under Arkansas negligence laws for their failure to do something which a reasonably careful person would do, or the doing of something which a reasonably careful person would not do, under circumstances similar to those shown by the evidence in this case as defined by *AMI (Civil) 302* and other applicable laws.

86.     Union County and these separate defendants caused Rodriguez to experience pain and suffering due to the deliberate indifference towards his medical needs in an amount to be proven at trial. This amount is recoverable by the plaintiffs for purposes of Rodriguez's estate.

87.     As a direct and proximate result of Union County and these separate defendants' conduct, Rodriguez and his family members/beneficiaries incurred mental anguish, loss of consortium, and other harms and losses, and have and will incur attorney fees and litigation costs.

## Count IV
### Outrage

88.     Plaintiffs repeat and re-allege each and every allegation in paragraphs 1 through 87 of this complaint with the same force and effect as if fully set forth herein.

89.     Based on the allegations set forth in the complaint, Union County and separate defendants Sheriff Ricky Roberts, Captain Richard Mitcham, Sgt. Joseph Walka, Sgt. Jedidiah Cotton, Correctional Officer Demario Freeman, and Sgt. John Ward are liable under Arkansas outrage laws for their conduct that was so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency,

and to be regarded as atrocious and utterly intolerable in a civilized society as defined by *AMI (Civil) 401* and other applicable laws.

90.     Union County and these separate defendants caused Rodriguez to experience pain and suffering due to the deliberate indifference towards his medical needs in an amount to be proven at trial. This amount is recoverable by the plaintiffs for purposes of Rodriguez's estate.

91.     As a direct and proximate result of Union County and these separate defendants' conduct, Rodriguez and his family members/beneficiaries incurred mental anguish, loss of consortium, and other harms and losses, and have and will incur attorney fees and litigation costs.

## <u>Count V</u>
## Wrongful Death and Survival (*Ark. Code. Ann. §§ 16-62-101 and 16-62-102*)

92.     Plaintiffs repeat and re-allege each and every allegation in paragraphs 1 through 91 of this complaint with the same force and effect as if fully set forth herein.

93.     Based on the allegations set forth in the complaint, Union County and separate defendants Sheriff Ricky Roberts, Captain Richard Mitcham, Sgt. Joseph Walka, Sgt. Jedidiah Cotton, Correctional Officer Demario Freeman, and Sgt. John Ward are liable under the Arkansas Wrongful Death and Survival laws, *Ark. Code Ann. §§ 16-62-101* and *102*, for tortiously causing the loss of life, death, pre-death pain and suffering, and other harms and losses of Rodriguez by violating the applicable correctional and medical standards of care.

94.     Union County and these separate defendants caused Rodriguez to experience pain and suffering due to the deliberate indifference towards his medical needs in an amount to be proven at trial. This amount is recoverable by the plaintiffs for purposes of Rodriguez's estate.

95.     As a direct and proximate result of Union County and these separate defendants' conduct, Rodriguez and his family members/beneficiaries incurred mental anguish, loss of consortium, and other harms and losses, and have and will incur attorney fees and litigation costs.

**B.      Against the Corporate Defendant Turn Key and Its Employees/Agents**

<u>Count VI</u>
**Deprivation of Civil Rights (42 U.S.C. § 1983)**

96.     Plaintiffs repeat and re-allege each and every allegation in paragraphs 1 through 95 of this complaint with the same force and effect as if fully set forth herein.

97.     Based on the allegations in this complaint, Turn Key and separate defendants Harley West, LPN, Kasie Sanford, LPN, and Deanna Hopson, M.D. are liable under *42 U.S.C. § 1983* for violating plaintiffs' rights under the *Due Process Clause* of the *Fourteenth Amendment* to the *United States Constitution* while operating under color of law. This includes depriving Rodriguez of his *Fourteenth Amendment* right to adequate medical care and to be free from cruel and unusual punishment (which caused him avoidable and unnecessary pain and suffering, loss of

26

life, wrongful death, and other harms and losses), as well as depriving his surviving family members/beneficiaries of their constitutional liberty interest in their relationship and their society and companionship with him and to be free from avoidable and unnecessary mental anguish, loss of consortium, and other harms and losses.

98.     Rodriguez suffered great physical pain and emotional distress up to the time of his death, loss of enjoyment of life, loss of life, and other harms, losses, and damages as set forth herein.

99.     Turn Key and separate defendants Harley West, LPN, Kasie Sanford, LPN, and Deanna Hopson, M.D. knew that failure to provide Rodriguez with timely medical treatment could result in further significant injury and the unnecessary and wanton infliction of pain, but disregarded that serious medical need, causing Rodriguez great bodily harm and death.

100.   As a direct and proximate result of Turn Key and separate defendants Harley West, LPN, Kasie Sanford, LPN, and Deanna Hopson, M.D.'s actions, Rodriguez suffered great physical pain and emotional distress up to the time of his death, loss of enjoyment of life, loss of life, and other harms, losses, and damages as set forth herein, and have and will incur attorney fees and litigation costs.

**<u>Count VII</u>**
**Violation of the Arkansas Civil Rights Act**
**(*Ark. Code. Ann. § 16-123-105*)**

101.   Plaintiffs repeat and re-allege each and every allegation in paragraphs 1 through 100 of this complaint with the same force and effect as if fully set forth herein.

102.   Based on the allegations set forth in the complaint, Turn Key and separate defendants Harley West, LPN, Kasie Sanford, LPN, and Deanna Hopson, M.D. are liable for tortiously causing the loss of life, death, pre-death pain and suffering, and other harms and losses of Rodriguez by violating the applicable correctional and medical standards of care and by violating *Article 2 § 8* and *Article 2 § 15* of the *Arkansas Constitution*—giving rise to a claim under the Arkansas Civil Rights Act, *Arkansas Code Ann. § 16-123-105.*

103.   Turn Key and these separate defendants caused Rodriguez to experience pain and suffering due to the deliberate indifference towards his medical needs in an amount to be proven at trial. This amount is recoverable by the plaintiffs for purposes of Rodriguez's estate.

104.   As a direct and proximate result of Turn Key and these separate defendants' conduct, Rodriguez and his family members/beneficiaries incurred mental anguish, loss of consortium, and other harms and losses, and have and will incur attorney fees and litigation costs.

## Count VIII

### Medical Malpractice (Ark. Code Ann. §16-114-201 et seq.)

105.    Plaintiffs repeat and re-allege each and every allegation in paragraphs 1 through 104 of this complaint with the same force and effect as if fully set forth herein.

106.    Turn Key and separate defendants Harley West, LPN, Kasie Sanford, LPN, and Deanna Hopson, M.D. deviated from the acceptable standard of medical and correctional care, and did not apply the skill and learning the law required, in the following respects:

a)      Failure to communicate critical information to a doctor, hospital, and others, including, without limitation, vital signs, symptoms, and substantial changes in condition of Rodriguez;

b)      Failure to recognize, intervene, and prevent the deterioration Rodriguez's health and medical condition;

c)      Failure to timely call an ambulance or other emergency interventions;

d)      Failure to timely transfer Rodriguez to a higher level of care;

e)      Failure to properly follow Rodriguez and prevent the failures and deterioration of Rodriguez as set forth herein;

f)      Failure to provide the necessary care and services and sufficient staff to meet the total needs of Rodriguez on a 24-hour, 7-day a week basis and attain or maintain his highest practicable physical, mental, and psychosocial well-being as determined by timely assessments and an individual plan of care;

g)      Failure of to provide adequate supervision and assistance to prevent the injuries set forth herein;

h)      Failure to protect and promote Rodriguez's right to a safe environment;

i)      Failure to adequately assess, evaluate, and supervise the staff to ensure that Rodriguez received appropriate care in accordance with professional standards

29

of quality, facility policy and procedure, and the laws, regulations, and rules applicable to the facility;

j)      Failure to provide, implement, and assure an adequate, comprehensive, and accurate care plan based on the needs and functional capacity of Rodriguez that met his physical, mental, and psychosocial needs as identified in a comprehensive assessment with revisions and modifications, as his needs changed;

k)      Failure to provide care and treatment to Rodriguez in accordance with his care plan and professional standards of quality, facility policy and procedure, and the laws, regulations, and rules applicable to the facility;

l)      Failure to discharge its legal and lawful obligations by assuring that professional standards of quality, facility policy and procedure, and the laws, regulations, and rules applicable to the facility were consistently complied with on an on-going basis, that they remained up-to-date and modified as problems arose, and that appropriate corrective measures were implemented to correct problems concerning inadequate care;

m)      Failure to use the degree of skill and care required of it when faced with the conditions of Rodriguez;

n)      The failure to maintain accurate medical and other records on Rodriguez in accordance with accepted professional standards that are complete, accurate, timely, and organized, including, at a minimum, documented evidence of safety checks, assessments, the needs of Rodriguez, and the care and services provided;

o)      Other failures as set forth in the records, discovery, and deposition testimony taken in this case, including without limitation:

o   Mr. Rodriguez was an alcoholic and was physically dependent on alcohol. In addition, he had chronic medical conditions of hypertension, diabetes and abnormal liver function tests. It was entirely foreseeable that Mr. Rodriguez might well develop an alcohol withdrawal syndrome when he was suddenly incarcerated and separated from his daily alcohol supply. These baseline factors were all easily able to be ascertained by those at the UCJ who came in contact with Mr. Rodriguez during his June 2022 incarceration. In fact, the Defendants all documented quite well that they were aware of these factors. It should have not, and apparently did not, surprise anyone that Mr. Rodriguez would develop

alcohol withdrawal syndrome once incarcerated.

o Persons at risk for alcohol withdrawal syndrome must be assessed for the development of withdrawal symptoms, they must be monitored serially, and an appropriate plan must be put in place to prevent or treat any withdrawal symptoms that develop.

o Mr. Rodriguez was not assessed for the first 26 hours he was incarcerated. It is not clear to me at this point if that was an isolated oversight or is part of a pattern and practice at the UCJ. It is also not clear at this point who was responsible for screening Mr. Rodriguez on the day of his booking. It is hoped that fact depositions testimony will elucidate this.

o When Mr. Rodriguez did receive an intake screening 26 hours after his arrest, he was already experiencing significant alcohol withdrawal symptoms. Nurse Sanford readily identified this with the help of the screening tools in place in Turn Key's EHR, which also prompted her to take the appropriate action of referral to/consultation with the physician responsible at the UCJ. Her actions on this day were within the standard of care.

o There is no evidence in the records I have reviewed in this case, that Turn Key followed its own policy requiring protocols for withdrawal management to be approved or ensuring that they were "current" and "consistent with nationally accepted guidelines." They were not, and were also below the standard of care. Protocols which do not contemplate the use of benzodiazepines at any point in the management of alcohol withdrawal syndrome cannot be within the standard of care. (There would be an exception for situations in which benzodiazepines or other prescription drugs were not used at all, but the patient was referred to a facility that did use benzodiazepines if any alcohol withdrawal symptoms developed. That was clearly not the case here.)

o Dr. Hopson's orders for the management of Mr. Rodriguez's alcohol withdrawal syndrome were far below the standard of care. She did not prescribe any medication which would be expected to have any effect at all on the severity of the alcohol withdrawal syndrome or its course. Her orders are tantamount to leaving the alcohol withdrawal syndrome completely untreated. The reason for Dr. Hopson's use of completely ineffective prescriptions for the treatment of alcohol withdrawal syndrome is not entirely clear at this point.

o It does appear that Dr. Hopson's protocol, or at least the prompts in the Turn Key EHR, prompt the UCJ nurses to serially monitor the progression of the alcohol withdrawal syndrome and provide prompts when to consult the provider again. Both Nurse Sanford and Nurse West failed to do this. These actions are both below the standard of care.

o Mr. Rodriguez's symptoms and time course are completely consistent with the progression of the untreated alcohol withdrawal syndrome. His worsening was entirely foreseeable and was more likely than not preventable had he received appropriate treatment.

o Mr. Rodriguez developed multisystem organ failure which led to his death. Fortuitously, Mr. Rodriguez had blood tests obtained the day before he was incarcerated which showed that he did not have multi-system organ failure just prior to his incarceration. The intervening factor was untreated severe alcohol withdrawal which led to this organ failure and his death.

o The UCJ staff told the hospital that Mr. Rodriguez developed alcohol withdrawal symptoms on Thursday. That is consistent with my reading of the records. The alcohol withdrawal syndrome would be predictably progressive. It is clear that at least by Sunday, 6/12/2022 Nurse West's assessment of Mr. Rodriguez was not consistent with the other information we know about Mr. Rodriguez's clinical condition from Sgt. Walka's incident report and the other inmates' reports. By this point, Mr. Rodriguez was clearly confused, delirious and hallucinating. Nurse West's assessment on Sunday, 6/12/2022 is so clearly inconsistent with his clinical condition on that day as to be concerning that she performed only a cursory assessment, ignored the development of these concerning symptoms, or failed to perform the assessment at all. Perhaps her deposition testimony will clarify what failure occurred. In any event, his abnormal vital signs and CIWA assessments should have prompted a reasonable nurse to consult a provider or send Mr. Rodriguez to the hospital on that day, especially because he wasn't receiving any treatment for his progressive condition.

o Neither Nurse Sanford nor Nurse West contacted a provider again despite Mr. Rodriguez's abnormal vital signs and CIWA scores. This failure is below the standard of care and directly lead to Mr. Rodriguez's severe alcohol withdrawal syndrome and death.

o As concerning or possibly more so, is Nurse Sanford's actions on the morning of 6/13/2022. Nurse Sanford saw and assessed Mr. Rodriguez inside the UCJ when he was clearly unresponsive and having a medical

32

emergency. Any reasonable nurse, and even a non-medically trained layperson, would be able to detect that Mr. Rodriquez was suffering from a medical emergency and that an ambulance needed to be called. Instead, she (and the correctional officers discussed below) stood by while Mr. Rodriguez was released from custody and was prepared for a routine transport to the hospital in a custody car. She disregarded what should have been clearly apparent to be a serious medical need.

o On June 9, 2022, LPN Sanford appropriately determined in Intake that Mr. Rodriguez was at risk for alcohol withdrawal. She obtained orders from Dr. Hopson to initiate the Drug and Alcohol Withdrawal protocol and completed the initial assessment, on which Mr. Rodriguez scored 15. LPN Sanford noted that Mr. Rodriguez would receive clonidine for alcohol detox support. She also measured Mr. Rodriguez's vital signs three times, an hour apart, as the first two measures were grossly abnormal. There is no indication that Dr. Hobson or any provider was contacted regarding the seriously high vital sign measurements, but they should have, especially since Mr. Rodriguez was a patient newly admitted to the facility with a history of hypertension, diabetes, and alcohol use disorder. Based on the documented time Dr. Hopson was contacted to initiate the Drug and Alcohol Withdrawal, LPN Sanford may have discussed Mr. Rodriguez's first very high blood pressure and tachycardia (although she did not document this in the health record), but subsequent vitals were measured after that call and required another call to a provider. The failure of LPN Sanford to contact a provider about Mr. Rodriguez's high blood pressure and tachycardia deviated from the standard of nursing care.

o On June 10, 2022, LPN Sanford and LPN West ordered medication for Mr. Rodriguez under Dr. Hopson's name, but there is no documentation that Dr. Hopson was contacted. In addition, Mr. Rodriguez's vital signs were measured on June 10, 2022, twice and both met the criteria under which a provider had to be contacted, but there is no indication that this occurred. The failure of LPN Sanford and LPN West to contact Dr. Hopson for medication orders deviated significantly from the standard of nursing care. The failure of LPN Sanford to contact a provider and report Mr. Rodriguez's abnormal vital signs per the health record parameters and prudent patient care deviated significantly from the standard of nursing care.

o On June 11, 2022, Mr. Rodriguez had significantly abnormal

vital signs, and his Drug and Alcohol Withdrawal scores were 8 and 9, respectively, and again no provider was notified. The failure of healthcare staff to notify a provider per their health record parameters and prudent patient care deviated significantly from the standard of nursing care.

o   On June 12, 2022, Mr. Rodriguez's Drug and Alcohol Assessments indicated a significant deterioration in his condition – a measure of 12 at approximately 0859 hours rising to a measure of 14 at approximately 1828 hours.  Mr. Rodriguez's appearance included diaphoresis with obvious beads of sweat in the morning. This was also the day that Mr. Rodriguez had been acting "weird" in the housing unit during the overnight and was transferred to Booking 3 for closer observation, and when Officer 1546 "attempted" to converse with Mr. Rodriguez.  His vital signs in the morning included a high blood pressure reading of 160/102 and, in the evening, a high blood pressure reading of 148/115.  Given this history, nursing staff should have completed an evaluation of Mr. Rodriguez and contacted a provider.  The failure of nursing staff to consider Mr. Rodriguez's presentation and abnormal findings and consult with a provider deviated significantly from the standard of nursing care.  If they had a contacted a provider, more likely than not, a prudent provider would have sent Mr. Rodriguez to the emergency department for the diagnostic testing, care, and treatment his worsening alcohol withdrawal required.

o   On June 13, 2022 at approximately 0515 hours Sergeant Walka noted that Mr. Rodriguez was on the floor, face down, wearing only his underwear, shaking and not responsive to the officers, and he did not contact the on-call provider to report these very serious signs, instead opting to wait for LPN Sanford to come on duty around 0800 hours. The failure of Sergeant Walka to contact the on-call provider as soon as he became aware of Mr. Rodriguez's serious condition deviated significantly from the applicable standard of care.

o   After Sergeant Walka's discovery of him on the floor, Mr. Rodriguez was not evaluated by healthcare staff for approximately three hours.  When LPN Sanford saw Mr. Rodriguez, he was slumped over in the wheelchair, looking poorly, and unable to hold up his body weight, and she decided that Mr. Rodriguez needed to go to the hospital due to "lengthy detox status and worsening of signs and symptoms."  She conducted no physical examination of Mr. Rodriguez, although

34

she did obtain vital signs and noted that Mr. Rodriguez was not able to hold up his body weight but did answer questions. Incredibly, LPN Sanford decided that Mr. Rodriguez did not need EMS transport, but rather he should go by facility vehicle. At that time, Mr. Rodriguez was unable to stand or even sit upright, and clearly required EMS transport, but it was only when Mr. Rodriguez became unresponsive in the back seat of the facility vehicle and ammonia inhalants had little effect on his mental status did LPN Sanford request emergency transport. The failure of LPN Sanford to complete an appropriate evaluation of Mr. Rodriguez, a gentleman for whom she cared for four days; who had a significant health history that included hypertension, diabetes and alcohol use disorder; who was being monitored for alcohol withdrawal; and who was now was exhibiting signs of significant withdrawal, like being on the floor only in his underwear, trembling, not responding to officers' directives, and incoherent; and send him to the emergency department via EMS as his condition required deviated significantly from the standard of nursing care.

o Typically, alcohol withdrawal is measured by serial CIWA-ar assessments, a reliable, valid tool per the American Society of Addiction Medicine (ASAM) and others. Based on the scores, medication may be ordered to help with the withdrawal, and benzodiazepines are the recommended first-line medication to reduce the signs and symptoms of withdrawal to include seizures and delirium. (ASAM, 2020; DOJ 2023). The first-line defense of benzodiazepines was never ordered for Mr. Rodriguez. In my experience, a benzodiazepine taper is initiated for patients scoring a 9 or more on the CIWA-ar. When opiate withdrawal is monitored, the COWS assessment is typically used. The CIWA-ar is also used to monitor benzodiazepine withdrawal.

o The questionnaire used for assessing a patient's level of withdrawal at the Union County Jail was called the Drug and Alcohol Withdrawal Assessment and it combined questions used to assess opioid withdrawal and alcohol withdrawal; thus, it is not specific to either condition. I have only seen this Assessment used at Turn Key facilities, and it is unknown if it is a validated tool that is accepted to be used to monitor and treat alcohol withdrawal syndrome like Mr. Rodriguez was experiencing. The notation in the health record indicates that a provider is to be contacted for any patient scoring 8 or greater

so that treatment can be started, but a provider was never contacted about Mr. Rodriguez's care and treatment, even though every measure was 8 or above. As a result, Mr. Rodriguez never received treatment for his alcohol withdrawal, and predictably, his condition deteriorated.

o   The failure of health care staff to notify a provider about Mr. Rodriguez's score 8 or above on the Drug and Withdrawal Assessment and their failure to contact a provider for Mr. Rodriguez's obvious deterioration in condition deviated significantly from the standard of nursing care.

o   Mr. Rodriguez was scheduled to see the provider at least 11 times during his incarceration, and all appointments were cancelled by staff.  These appointments were prompted  by elevated Drug and Alcohol Withdrawal Assessments, which, if not appropriately addressed, could lead to serious harm or death.  It is not known if there was no provider assigned and going to the Union County Jail, or whether they just did not see Mr. Rodriguez, but in any case, Mr. Rodriguez required an evaluation by a provider who could address his worsening alcohol withdrawal, but he never saw any provider, nor was a provider ever contacted on his behalf after the first day in intake. Turn Key was responsible for the healthcare of all persons incarcerated at the Union County Jail, and that included the provision of a provider who could conduct appropriate physical assessments, diagnose patients, and prescribe indicated medications and treatments. The failure of Turn Key to ensure the incarcerated patients at the Union County Jail had access to a provider who could address their health needs deviated significantly from the applicable standard of care.

107.   A reasonably prudent medical and correctional care provider operating under the same or similar conditions, as well as one following the standards of care as set forth in the *Arkansas Medical Negligence Act* and *AMI (Civil) 1501* would have provided the care listed above and would have foreseen that the failure to provide this care would result in devastating injuries and death to Rodriguez. Each of the foregoing acts of negligence on the part of Turnkey and these separate defendants

was a proximate cause of Rodriguez's injuries and death that were foreseeable to them.

108.    Moreover, the training, expertise, and experience of Turn Key allowed it to be able to anticipate and know that the lack of proper financial resources for the sufficient supervision, staffing, and supplying of their respective facilities would likely result in injuries to Rodriguez.

109.    Furthermore, Turn Key has vicarious liability for the acts and omissions of all persons or entities under its control either directly or indirectly whose acts or omissions injured Rodriguez including its employees, agents, consultants, medical directors, and independent contractors, whether in-house or outside entities, individuals, agencies, or pools causing or contributing to the injuries of Rodriguez.

110.    As a direct and proximate result of Turn Key and separate defendants Harley West, LPN, Kasie Sanford, LPN, and Deanna Hopson, M.D.'s actions, Rodriguez suffered great physical pain and emotional distress up to the time of his death, loss of enjoyment of life, loss of life, and other harms, losses, and damages as set forth herein, and have and will incur attorney fees and litigation costs.

## Count IX
### Outrage

111.    Plaintiffs repeat and re-allege each and every allegation in paragraphs 1 through 110 of this complaint with the same force and effect as if fully set forth herein.

112.    Based on the allegations set forth in the complaint, Turn Key and separate defendants Harley West, LPN, Kasie Sanford, LPN, and Deanna Hopson, M.D. are liable under Arkansas outrage laws for their conduct that was so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious and utterly intolerable in a civilized society as defined by *AMI (Civil) 401* and other applicable laws.

113.    Turn Key and these separate defendants caused Rodriguez to experience pain and suffering due to the deliberate indifference towards his medical needs in an amount to be proven at trial. This amount is recoverable by the plaintiffs for purposes of Rodriguez's estate.

114.    As a direct and proximate result of Turn Key and these separate defendants' conduct, Rodriguez and his family members/beneficiaries incurred mental anguish, loss of consortium, and other harms and losses, and have and will incur attorney fees and litigation costs.

## Count X

**Wrongful Death and Survival (*Ark. Code. Ann. §§ 16-62-101 and 16-62-102*)**

115.    Plaintiffs repeat and re-allege each and every allegation in paragraphs 1 through 114 of this complaint with the same force and effect as if fully set forth herein.

116.    Based on the allegations set forth in the complaint, Turn Key and separate defendants Harley West, LPN, Kasie Sanford, LPN, and Deanna Hopson, M.D. are liable under the Arkansas Wrongful Death and Survival laws, *Ark. Code*

38

*Ann. §§ 16-62-101* and *102*, for tortuously causing the loss of life, death, and pre-death pain and suffering of Rodriguez by violating the applicable correctional and medical standards  of care.

117.   Rodriguez experienced pain and suffering due to the deliberate indifference towards his medical needs in an amount to be proven at trial. This amount is recoverable by the plaintiffs for purposes of Rodriguez's estate.

118.   As a direct and proximate result of Turn Key and these separate defendants' conduct, Rodriguez and his family members/beneficiaries incurred mental anguish, loss of consortium, and other harms and losses, and have and will incur attorney fees and litigation costs.


## VI.   DAMAGES

119.   As a proximate result of the above conduct, plaintiffs are entitled to damages against defendants for medical expenses and costs, pain, suffering, mental anguish, grief, scars and disfigurement, disability, trauma, loss of enjoyment of life, loss of quality of life and personal dignity, humiliation, fright, emotional distress, loss of life, funeral and related expenses, loss of consortium, loss of contributions, death, all elements under *AMI 2216*, and other injuries, damages, harms, and losses as described herein and in the medical records and discovery in this case, in an amount exceeding the minimum amount required for federal court jurisdiction in diversity of citizenship cases.

120.    Moreover, because defendants' conduct was not a mistake and they were on notice of the matters set forth in this complaint, and they knew or should have known, in light of the surrounding circumstances, that their conduct would naturally and probably result in injury, yet they still failed to discharge their responsibilities to Rodriguez and continued their conduct in reckless disregard and with a conscious indifference for his rights and safety causing him to suffer the injuries set forth herein, defendants are liable for punitive damages in an amount exceeding the minimum amount required for federal court jurisdiction in diversity of citizenship cases and sufficient to punish defendants and deter them and others from similar conduct.

## VII.   JURY DEMAND

121.    Plaintiffs hereby demand a trial by jury.

## VIII. PRAYER FOR RELIEF

Plaintiffs ask that the Court award them the following relief:

A.     A Declaratory Judgment providing that defendants' individual and collective conduct violated plaintiffs' state and federal rights;

B.     All available compensatory damages, including, but not limited to damages to the decedent for his mental and physical pain and suffering and the loss of the value of his life; damages to his surviving family members for their loss of society and companionship, loss of love and affection, loss of household services,

and loss of care, comfort, and guidance; and all other compensatory damages available under state and federal law or alleged herein;

    C.    Punitive damages against all defendants;

    D.    An Equitable Relief admission of the allegations stated in this Complaint, in writing, and an oral and written apology for same, in person, from defendants;

    E.    Attorneys' fees and costs;

    F.    Prejudgment interest as appropriate; and

    G.    Any such other relief that this Court deems just and equitable.

**Dated May 30, 2024.**

Respectfully submitted,

M. Darren O'Quinn, AR Bar No. 87-125
**LAW OFFICES OF DARREN O'QUINN PLLC**
B. Ram Suri Professional Building
36 Rahling Circle, Suite 4
Little Rock, AR 72223
Phone: (501) 817-3124
Fax: (501) 817-3128
Email: Darren@DarrenOQuinn.com

And

Angela Galvis Schnuerle, ABA #2004196
GALVIS LAW, PLLC
5523 JFK Blvd.
North Little Rock, AR 72205
Phone: (501) 220-1116
Email: angie@galvis.legal

**Attorneys for Plaintiffs**

## CERTIFICATE OF SERVICE

I, M. Darren O'Quinn, state that on May 30, 2024, that the foregoing was filed with the Court's electronic filing system, which in turn will automatically serve all Counsel of Record with same, as well as email to:

Mark D. Wonkum ([wankum@amhfirm.com](mailto:wankum@amhfirm.com))
Amelia F. Botteicher ([botteicher@amhfirm.com](mailto:botteicher@amhfirm.com))
**Anderson, Murphy & Hopkins, L.L.P.**
101 River Bluff Drive, Suite A,
Little Rock, Arkansas 72202-2267

_____
M. Darren O'Quinn